# Fine *v.* State.

## (*Knoxville*, September Term, 1951.)

Opinion filed February 9, 1952.

HUGH SIMPSON, of Knoxville, for plaintiff in error Fred Fine.

KNOX BIGHAM, Assistant Attorney General, for the State.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error, who will be later referred to as the defendant, was convicted in the criminal court of Knox County of voluntary manslaughter and sentenced to the penitentiary for not less than two (2) and not more than ten (10) years.

While numerous assignments of error are assigned to the action of the trial court in refusing to grant de-

fendant a new trial we think the determinative question is whether or not the deceased died as the result of a criminal agency or from natural causes. The defendant, Fine, and the deceased, Hodges, were residents of Jefferson County and lived upon adjoining farms. They were interested in buying and selling livestock and had come to the Knoxville Stock Yards on the day of the alleged homicide. The two men had previously engaged in a dispute about a line fence, but this difference was not of a serious nature. A witness for the State, one James Bailey, testified that the defendant had made the remark, "I'll get mine if I have to beat the devil out of him (referring to the deceased) and throw him in the creek." The defendant evidently was referring to the fact that the deceased owed him a few dollars for repairing the line fence.

There is little, if any, conflict in the evidence upon which the State relies to support the conviction of the defendant. A fair statement of the facts appears in the State's brief, as follows:

"Witnesses introduced on behalf of the State testified that within ten to thirty minutes after Hodges' arrival at the stockyards they saw him and Plaintiff in Error together outside the calf barn. Plaintiff in Error was seen to place his hand on deceased's shoulder and shake him. He then placed one or both hands about Hodges' throat and choked him. Plaintiff in Error turned him loose within a matter of seconds and deceased slumped to the ground near, if not against, the side of the calf barn. * * *

"Deceased was taken immediately to a Knoxville hospital and transferred that same afternoon to St. Mary's Hospital, also in Knoxville. He stayed at St. Mary's about two weeks and never regained conscious-

ness while there. He was then taken to Milligan Clinic in Jefferson City where he stayed another two weeks, never regaining consciousness there. From Milligan Clinic he was taken to his home where he died on February 17, 1950. He remained paralyzed from the time of the assault until his death. His wife seemed to think that after he was taken to his home he was conscious part of the time. After his death she refused to give permission to perform an autopsy."

Dr. Herbert Acuff, a State's witness, saw the deceased at St. Mary's Hospital on the afternoon following the alleged assault. He gave it as his opinion that Hodges had suffered a ruptured blood vessel in the brain which had paralyzed his right side. The blood pressure of the deceased was found to be 220 over 120, which according to Dr. Acuff, was "alarmingly high", and "*excitement of any kind or nature* will accelerate that pressure, and of course the acceleration of the pressure forcing into the little blood vessels in the brain." (Emphasis supplied.)

"Q. State whether or not in your opinion the increase in blood pressure caused the cerebral hemorrhage at that time, while he was being choked. A. Well, from some cause or other the pressure increased; because he had an alarmingly high pressure, and if he was already carrying all the column the pressure could stand, and then he was beaten, or any excitement, or what not, would normally cause a hemorrhage.

"Q. Would you or would you not, then, Doctor, say that this assault on the body of Mr. Hodges in the condition he was in either directly or indirectly caused this cerebral hemorrhage with the resulting death? A. I wouldn't want to say that that alone did it, because the man had the high pressure he did.

"Q. Yes, I understand. A. I mean * * *

"Q. But was it a contributing factor or not? A. I can truthfully say that it was a contributing factor."

It definitely appears that this expert medical witness, in response to a hypothetical question, was rather hesitant in expressing the opinion that the act of the defendant in "choking the deceased" was the "effective agency" in causing his death. He would go no further than to say that in his opinion "it was a contributing factor." This opinion was later modified. He gave the following testimony on cross-examination:

"A. Well, the blood pressure for a man of his age should have been around 150 over around 80 to a hundred. (Mr. Hodges was about 75). So the 220 was an inordinately high pressure.

"Q. He had how much above the normal pressure? A. At least 70 or 80 above. And in addition to that a man at that age has hardening of the arteries, and any pressure or any sudden stroke or anything of that character would break the artery and cause it to rupture. And so for that reason I think that this sudden increase in the pressure for whatever cause was responsible for the split in the vessel.

* * * * * *

"Q. Is that a highly dangerous condition? A. Yes.

"Q. Would a person of that age with that blood pressure be liable to have a stroke without anybody even touching them? A. Yes, he could have.

"Q. Could he have it while he was in bed? A. He could have."

The defendant testified he had known the deceased for about five years and they had always been on friendly terms; that when they met at the stockyards they talked

briefly about the repairs to a line fence; that in the course of the conversation Hodges became very angry when the defendant suggested that deceased owed him "about $5.00", saying, "You are a damned liar, it ain't that much." The defendant further testified that deceased "had a wild, angry look on his face, one he had never seen before." He thought deceased was about to attack him and he "grabbed him by the shirt collar" as deceased ran his hand in his pocket. When asked how long he held Hodges, he stated, "I turned him loose just as I took a breath; it was over just in a second", that he staggered back about three or four steps against the seed house and slumped over on his left side. The testimony of the defendant was corroborated by several eye-witnesses.

While there is testimony to the effect that there were fingerprints and scratches on deceased's neck, the hospital records fail to confirm these facts. Dr. Frank L. Milligan, a qualified medical expert, testified that it would be very difficult to ascertain without an autopsy, if the hemorrhage was due to a ruptured blood vessel or tumor. The hospital records also showed that the deceased suffered a cardiac condition in August, 1949, when he had a temporary partial paralysis of the left arm. In answering the same hypothetical question which had been propounded to Dr. Acuff, Dr. Milligan testified as follows: "We see patients who have cerebral hemorrhage under every kind of a condition you want to mention, some asleep, some at work, some having their dinner, and what not. There is no way to tell when you are going to have a heart attack or cerebral accident."

The death certificate shows that death was primarily pulmonary infection, commonly known as pneumonia,

secondary cause was cerebral hemorrhage, and his paralysis was the secondary cause.

In the light of the proven facts, including that of the medical experts bearing upon the cause of death, it cannot be said with any degree of certainty that the deceased died as the result of any criminal agency. The conclusion reached by the jury, of necessity, had to be based upon an inference upon an inference and upon a third inference which could not be thought of otherwise than a fantastic speculation. "To sustain a conviction, proof of the criminal agency is as indispensable as the proof of death." Wharton's Criminal Evidence, Vol. 2, Section 872, page 1506. Moreover it is settled law in all jurisdictions that criminal agency must be shown beyond a reasonable doubt; it cannot rest upon conjecture or speculation.

In *Rucker* v. *State*, 174 Tenn. 569, 129 S. W. (2d) 208-210, the deceased suffered a broken jaw, and wound on the side of the head at the hands of the defendant; he was admitted to the hospital where his blood pressure was recorded as 180/110 which was high. Several days thereafter his blood pressure rose rapidly, "reaching the very high figure of 260/130, and he died in about two hours." In passing upon the question of criminal agency it was said: "The rule is well expressed in *State* v. *Rounds*, 104 Vt. 442, 160 A. 249, 254, as follows: 'In a homicide case, where the life or liberty of a citizen is at stake, and where the guilt of the accused must be established beyond a reasonable doubt, the causal connection between the death of the decedent and the unlawful acts of the respondent cannot be supported on mere conjecture and speculation. In *Wellman* v. *Wales*, 98 Vt. 437, 440, 129 A. 317, 319, we said that: "Evidence which merely makes it possible for the fact in issue to be as

alleged, or which raises a mere conjecture, surmise, or suspicion, is an insufficient foundation for a verdict.'' ' ''

The foregoing statement finds support in 26 Am. Jur., Section 47, p. 190, as follows: ''Under the rule of the early common law, to constitute a culpable homicide the cause of death must have been corporal, not nervous or emotional, and it has been said in modern decisions that if a person, by stimulating the imagination of another, or by ill usage, puts him in such an intense emotional state of grief, fear, or the like, that death results, the killing is not by the law a foundation of criminal responsibility.''

The remainder of the text (Section 47) refers to a modification of this rule by the English Courts, and also to what we consider exceptions to the majority rule.

The leading case in this country which appears to be in conflict with the foregoing text, and especially our own case of *Rucker* v. *State,* supra, is In re Heigho, 18 Idaho 566, 110 P. 1029, 32 L. R. A., N. S., 877, where the accused was being held on a charge of manslaughter. It seems that Heigho, who had become incensed at remarks made by one Barton, went to the latter's home and engaged him in a fight, which so frightened Barton's mother-in-law, who had ''aneurism of the aorta'' that it ruptured, causing her death in thirty minutes. The Idaho Court held that death caused by fright or terror could be the basis of criminal liability.

In some cases it is said that the act of the deceased, resulting in his death (not being corporally injured by the defendant), must have been the natural and probable consequence of the unlawful conduct of another, as in *Adams* v. *People,* 109 Ill. 444, 50 Am. Rep. 617, where the defendants by threats of violence and display of deadly weapons caused the deceased to jump to his death from a moving train. To the same effect is

our own case of *Letner* v. *State,* 156 Tenn. 68, 299 S. W. 1049, 55 A. L. R. 915, where the defendant shot into the river near a small boat which so frightened the deceased that he jumped overboard and was drowned. Many cases are there cited which support the general rule "that every person will be held to contemplate and be responsible for the natural consequences of his own act; but he will not be held criminally responsible for a homicide, *unless his act can be said to be the cause of death.*" 156 Tenn. at page 73, 299 S. W. at page 1050. (Emphasis supplied.) The Court made this further observation: "When a person unintentionally or accidentally kills another, while engaged in an unlawful act, the authorities all hold that he is guilty of some degree of homicide."

 There is no analogy between the cases cited in the Letner case and the case at bar for the reason that the death of Mr. Hodges was neither accidental nor intentional; nor can it be said that the defendant, by word or act, caused his death, which occurred two months and seventeen days after he is said to have had a brain hemorrhage. It is settled law in all homicide cases that the collateral crime, i. e. the alleged unlawful act antedating death, must be so integrated with and related to the homicide that it can be said to have proximately caused or contributed to it. The related occurrences in the instant case, which immediately preceded the sudden paralysis of the deceased, were so remote in causal effect that his death can only be thought of as a fortuitous circumstance.

The facts disclosed in this record are wholly insufficient to establish criminal liability. Reversed and remanded.