STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Stephen SEREBIN, Defendant-Appellant.

Supreme Court

No. 82–232–CR. Argued March 28, 1984.—Decided June 29, 1984.

(Also reported in 350 N.W.2d 65.)

For the plaintiff-respondent-petitioner the cause was argued by *Kirbie Knutson,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For the defendant-appellant there was a brief by *Robert E. Sutton* and *Sutton and Kelly,* Milwaukee, and oral argument by *Robert E. Sutton.*

LOUIS J. CECI, J. This review concerns a court of appeals opinion[1] reversing a jury verdict finding the defendant, Stephen Serebin, guilty of homicide by reckless conduct, contrary to sec. 940.06, Stats. 1975, and guilty of twelve counts of abuse of inmates of an institution, party to a crime, contrary to sec. 940.29(7), Stats. 1975. The court of appeals found the evidence to be insufficient to support the convictions and reversed. Because we find the evidence to be sufficient to support the conviction for abuse of inmates, but insufficient to support the homicide conviction, we reverse in part, affirm in part, and remand the cause to the court of appeals.

The offenses for which the defendant was charged allegedly took place between about December 20, 1975, and June 30, 1976, at the Glendale Convalescent Center (Glendale). The defendant was the administrator of the Glendale nursing home from 1973 to 1977. Following a 1978 John Doe investigation, criminal charges were filed against the defendant and the owners of the nursing home, alleging one count of homicide by reckless conduct and fifty-eight counts of abuse of inmates. The count of homicide by reckless conduct was based upon the incident in which one of the residents, Bruno Dreyer, wandered out of the nursing home and died from exposure to the cold, on February 7, 1976. The counts of abuse stemmed from various residents who lost weight and developed bedsores. The criminal complaints alleged that Serebin caused the death of Dreyer and the bedsores and weight loss in the other residents by failing to provide a sufficient staff and adequate diet. More facts will be developed throughout the remainder of this opinion.

A jury trial was conducted on October 12, 1981, through November 14, 1981. The jury found the defend-

---

[1] *State v. Serebin*, 114 Wis. 2d 314, 338 N.W.2d 855 (Ct. App. 1983).

ant guilty of the homicide charge and guilty of twelve counts of inmate abuse. The defendant's postconviction motion for judgment notwithstanding the verdict or, alternatively, for a new trial, was denied, and on February 8, 1982, the defendant was sentenced to serve a cumulative term of six years.

After appealing his judgment of conviction, the defendant petitioned for bypass of the court of appeals. This court denied Serebin's petition for bypass on September 21, 1982. The court of appeals then certified the case to this court, and the certification was refused on April 22, 1983.

The court of appeals subsequently issued its decision on July 26, 1983. The court noted that for the state to convict Serebin of any of the charged crimes, it must prove beyond a reasonable doubt that a causal connection existed between his actions and the harm which resulted. *State v. Serebin,* 114 Wis. 2d at 317. The court stated that whether the evidence adduced at trial is sufficient to prove causation is a question of law which the appellate courts may independently review and concluded that a jury could not have reasonably inferred that the defendant's failure to provide a sufficient staff caused Dreyer's death. *Seraphine v. Hardiman,* 44 Wis. 2d 60, 65, 170 N.W.2d 739 (1969), and *First Nat. Leasing Corp. v. Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977). Rather, the court concluded that,

"The most favorable inference that can be drawn from the state's evidence is that a reasonable number of additional staff would have made it less probable that Dreyer could leave unnoticed. An unspecified degree of probability does not permit the inference of a fact beyond a reasonable doubt." *State v. Serebin,* 114 Wis. 2d at 318.

Consequently, the court of appeals reversed the conviction for homicide by reckless conduct.

Concerning the conviction for abuse of the nursing home residents, the court of appeals also concluded that the state had failed to prove the causal connection between the lack of staff and the bedsores and weight loss. The court noted that both bedsores and weight loss may be attributed to numerous medical causes. Therefore, expert testimony was required to prove that these conditions were caused by Serebin's failure to hire a sufficient staff or provide an adequate diet. *State v. Serebin,* 114 Wis. 2d at 318–19, citing *Kelly v. Hartford Casualty Insurance Co.,* 86 Wis. 2d 129, 134–35, 271 N.W.2d 676 (1978). Because none of the experts who testified at trial had examined any of the twelve residents with weight loss and bedsores, nor had any expert given a specific cause for these conditions in a specific resident, the court concluded that the evidence was insufficient to allow the jury to infer that these conditions were caused by Serebin's neglect in failing to hire sufficient staff or provide a proper diet. *Id.* at 319–20. The court of appeals then reversed the abuse of inmates conviction.

The state subsequently petitioned this court for review, and we granted that petition.

There are two issues before this court on review. They are: (1) Was the evidence sufficient to support Serebin's conviction of homicide by reckless conduct arising from a resident's death while Serebin acted as administrator, and (2) was the evidence sufficient to support Serebin's conviction of twelve counts of abuse of nursing home residents?[2]

---

[2] The defendant also alleged that the following constitutional violations occurred in this case and deprived him of the right to a fair trial:

(1) That charging the defendant with fifty-eight separate misdemeanor violations was oppressive and unnecessarily excessive;

(2) That the defendant was not allowed to present any evidence in support of his motion concerning selective prosecution;

(3) That the defendant's motion to suppress the nursing home records which were seized without a warrant was denied;

## I.

WAS THE EVIDENCE SUFFICIENT TO SUPPORT SEREBIN'S CONVICTION OF HOMICIDE BY RECKLESS CONDUCT ARISING FROM A RESIDENT'S DEATH WHILE SEREBIN ACTED AS ADMINISTRATOR?

This court recently stated the following standard of review to be utilized when testing the sufficiency of the evidence to support a conviction in *State v. Alles*, 106 Wis. 2d 368, 376–77, 316 N.W.2d 378 (1982):

" 'We test the sufficiency of the evidence leading to the conviction by the oft-stated rules as follows: This court must affirm if it finds that the jury, acting reasonably, could have found guilt beyond a reasonable doubt. The function of weighing the credibility of witnesses is exclusively in the jury's province, and *the jury verdict will be overturned only if, viewing the evidence most favorably to the state and the conviction, it is inherently*

(4) That the defendant's motion for a change of venue was summarily denied without consideration of its merits;

(5) That the motion of the defendant to waive a jury because of the number and complexity of the counts and the apprehension of community prejudice against him was denied;

(6) That the *voir dire* examination was used by the prosecutor as a vehicle to appeal to the passions of the jurors;

(7) That the court refused to allow the defendant to introduce polygraph testimony to support his defense;

(8) That the prosecutor was allowed to introduce testimony at trial which brought collateral issues before the jury, including materials which would incite feelings of religious and racial prejudice;

(9) That the defendant was not allowed to introduce testimony of black character witnesses on his behalf; and

(10) That the opening and closing arguments of the prosecutor included statements designed to inflame the jury's passions and elicit a sympathetic response.

The court of appeals did not address these issues because it reversed both convictions on the sufficiency of the evidence.

*or patently incredible, or so lacking in probative value that no jury could have found guilt beyond a reasonable doubt.' Fells v. State,* 65 Wis. 2d 525, 529, 223 N.W.2d 507 (1974) (dealing with conviction of attempted first-degree murder and attempted armed robbery) (footnotes omitted) (emphasis added) ; *Cranmore v. State,* 85 Wis. 2d 722, 774, 271 N.W.2d 402 (Ct. App. 1978) ; *Gauthier v. State,* 28 Wis. 2d 412, 416, 137 N.W.2d 101 (1965) *cert. denied* 383 U.S. 916 (1966). We note that our review of sufficiency of the evidence questions is limited further by the principle that '[i]f more than one inference can be drawn from the evidence, the inference which supports the jury finding must be followed unless the testimony was incredible as a matter of law.' *Murphy v. State,* 75 Wis. 2d 522, 526, 249 N.W.2d 779 (1977) ; *See: State v. Lunz,* 86 Wis. 2d 695, 705, 273 N.W.2d 767 (1979) ; *Beavers v. State,* 63 Wis. 2d 597, 609, 217 N.W. 2d 307 (1974). These principles limiting our review are grounded on the sound reasoning that the jury has the 'great advantage of being present at the trial'; it can weigh and sift conflicting testimony and attribute weight to those nonverbal attributes of the witnesses which are often persuasive indicia of guilt or innocence. *See: Gauthier v. State, supra* at 416. It bears repeating that we will not substitute our judgment for that of the jury unless, under all the evidence presented, the jury *could not* have found guilt beyond a reasonable doubt. Thus, as we view it, if any possibility exists that the jury *could* have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, we will not overturn a verdict even if we believe that a jury *should* not have found guilt based on the evidence before it." (Emphasis added.)

For a jury to convict Serebin of homicide by reckless conduct, contrary to sec. 940.06, Stats. 1975, the jury must first find that the defendant's actions constituted reckless conduct. *See,* Wis. J I—Criminal 1160 (1962). Section 940.06(2), Stats. (1975), states,

"Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demon-

strates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. . . ."

The state argues that the jury reasonably found that the defendant willingly undertook to staff Glendale at a level which he knew created a situation of unreasonable risk for the patients. The state maintains that Serebin's staffing decisions and the conditions which resulted from these decisions caused Bruno Dreyer's death on February 7, 1976, due to his unsupervised wandering.

When we review the record in the instant case, it reveals that Serebin was the officially designated administrator of Glendale at the time of Dreyer's death. His testimony, which had originally been given at a John Doe proceeding and was subsequently introduced at trial, indicates that he was responsible for the day-to-day operation of Glendale. He supervised the care and treatment of the residents through the licensed personnel. Serebin also stated that he discussed the staffing patterns for the different shifts on the various units with the directors of nursing, which included a discussion of the number of licensed personnel to be employed by the home. The directors submitted staffing plans to Serebin, which he reviewed for feasibility. Serebin's main concern was operating within the budget.

At trial, Serebin denied that he had discussed staffing with the nursing directors. However, Regina Ahrenholz, one of the nursing directors, confirmed that she met with Serebin weekly to discuss staffing and submitted a schedule to him periodically.

The record also reveals that Dorothy Waggoner, a health facility surveyor for the state, testified that during her annual survey of Glendale in February of 1975, she found staffing deficiencies at Glendale "of such character

as to jeopardize the health, safety, and welfare of the patients." She ordered Glendale to correct these deficiencies.

Twelve nurses testified that during the winter of 1975–76, Serebin reduced the nursing staff further, even though he was told specifically by the nurses that these reductions would make it impossible to supervise and care for patients, especially those who had a tendency to wander around and try to leave the building. This testimony was corroborated by that of five aides. In particular, Luchia Byal testified that she resigned from Glendale twice in 1975 and 1976 because of insufficient staffing. She also testified that she spoke with Serebin weekly during the period from December, 1975, through June, 1976, concerning the inadequate care and supervision the residents were receiving due to the insufficient staffing. Sandra Baumgartner and Dolores Reynolds testified that they asked Serebin to stop admitting patients or to employ more staff. Baumgartner testified that Serebin said that he had to keep admitting residents and that hiring more staff would exceed his budget. Other nurses gave similar testimony.

The record also reveals that on January 27, 1976, a little more than a week prior to Dreyer's death, Darla Senn, a nursing consultant for the state, submitted a correction order to Serebin, characterizing the understaffing as "an occurrence which endangered the patients' health, welfare, and safety . . . ." This resulted from Senn's annual inspection of Glendale which was conducted in January of 1976.

As we noted above, the credibility of the witnesses is for the jury to determine. Although Serebin denied his participation in staffing decisions at trial, the testimony of other witnesses from which the jury could have concluded that Serebin's actions evinced reckless conduct is

overwhelming. The above evidence indicates that Serebin was repeatedly warned by his own staff and state officials that the insufficient staffing created a situation in which patients did not receive adequate care and supervision and especially that wandering residents could not be adequately watched. From this, a reasonable jury could have inferred that Serebin's actions regarding staff cuts and continued admissions created a high probability of death or great bodily harm. For example, if residents left the building and were exposed to the elements during harsh weather, or became ill or injured and required prompt medical attention, the lack of staff could aggravate those conditions, resulting in death or great bodily harm. It is common knowledge that elderly patients require close supervision and care because of the physical and mental conditions which often accompany the aging process. The evidence indicates that Serebin knowingly allowed the probability of such dangers to exist, from which the jury could infer a conscious disregard for the residents entrusted to his care and a willingness to take known chances of risks. The jury, therefore, could have concluded that in acting as he did, Serebin should have realized that he created a situation of unreasonable risk to the residents at Glendale. *See, Hart v. State,* 75 Wis. 2d 371, 397, 249 N.W.2d 810 (1977).

However, for a jury to convict Serebin of homicide by reckless conduct, the state must also prove that the defendant's reckless conduct *caused* Dreyer's death. Section 940.06(1), Stats. 1975, provides,

"Whoever causes the death of another human being by reckless conduct may be fined not more than $2,500 or imprisoned not more than 5 years or both."

In order to prove that the defendant's reckless conduct caused the death of Dreyer, the state is required to prove beyond a reasonable doubt that Serebin's recklessness in staffing Glendale at an insufficient level was "a sub-

stantial factor in producing the death." *Cranmore v. State,* 85 Wis. 2d 722, 775, 271 N.W.2d 402 (Ct. App. 1978) ; *Hart v. State,* 75 Wis. 2d at 397.

The evidence adduced at trial concerning whether or not Serebin's conduct caused Dreyer's death is as follows. Jeanne Raber, a licensed practical nurse, testified that she worked the night shift beginning February 6 and continuing through February 7, the date of Dreyer's death. Raber was in charge of 1 North, Dreyer's unit, as well as the other units. There were also two aides working on 1 North on the same date, although not for the entire duration of the night shift. The patient population of the three units totaled two hundred. Rose Marie Lietz, the night supervisor at Glendale, testified that prior to the staff cuts, three aides had worked on 1 North during the night shift, as well as one nurse who was responsible for 1 North and only one other unit.

Raber testified that because of the number of residents for whom she was responsible, she was not able to personally make rounds and observe all the patients. Therefore, she had to rely on her two aides to make the rounds. One of the aides, LaVonia Woods, testified that she assisted Dreyer to his room at 11:40 p.m., but did not see him get into bed. The aide testified that later in the evening, she looked into Dreyer's room without entering the room, and it appeared to her from the hallway that Dreyer was in his bed. She further testified that when she entered the rooms of individual patients, it was physicially impossible for her to see the corridor.

Serebin testified at Dreyer's inquest, which testimony was subsequently introduced at trial, that the doors leading from 1 North to the outside could not be kept locked because it was an emergency exit. There was an alarm installed on one door to alert the staff when it was opened. However, the sliding glass doors through which Dreyer apparently left had no such alarm.

Serebin also testified at the inquest that he knew that Dreyer had walked away from the ward on prior occasions by reviewing the 24-hour reports which were compiled by unit nurses daily and detailed new admissions, discharges, and changes in conditions. At trial, he testified that he only learned of Dreyer's propensity to wander when he read Dreyer's chart following his death.

The record indicates that when licensed practical nurse Linda Jones arrived at 6:30 a.m. on February 7, she told the aides to conduct a bed check. The aides told her that Dreyer was missing. Jones searched for him and observed footprints leading from the patio doors outside 1 North. She called the maintenance department and asked that they follow the footprints. Daniel Maciejewski, a maintenance worker, discovered Dreyer's body lying in the snow on Glendale's grounds. The parties stipulated at trial that the body was found at 8:45 a.m. and that the immediate cause of death, determined from an autopsy, was exposure to the cold, which probably occurred between midnight and 3:00 a.m. on February 7, 1976. The parties also stipulated that the temperature on that night ranged from 8° F. to 15° F.

Wisconsin Jury Instruction—Criminal 1160, dealing with homicide by reckless conduct, contains the following language concerning the second element of the offense:

"The second element of this offense requires that a relation of cause and effect exists between the death of ———— and the reckless conduct of the defendant, if the defendant engaged in such conduct. You are instructed that a relation of cause and effect exists between such conduct and the death of ———— when such conduct was a cause of death. There may be more than one cause of death. The conduct of one person alone might produce it, or the conduct of two or more persons might jointly produce it. Before such relation of cause and effect can be found to exist, however, it must appear that the conduct under consideration was a substantial factor in producing the death. That is to say, that it was a factor

actually operating and which had substantial effect in producing the death as a natural result."

*Wharton's* utilizes the following discussion concerning causation:

"Where the statute involves a specified result that is caused by conduct, it must be shown, as a minimal requirement, that the accused's conduct was an antecedent 'but for' which the result in question would not have occurred. This means that an accused's conduct must at least be a physical cause of the harmful result. But mere physical causation is not always enough; a particular physical cause is enough only when it is a cause of which the law will take cognizance. This idea has been implemented by requiring that the harmful result in question be the natural and probable consequence of the accused's conduct; if the physical causation is too remote, the law will not take cognizance of it. The same result has been achieved by requiring that the accused's conduct be a substantial factor in causing the harmful result or that it be the proximate, primary, efficient, or legal cause of such harmful result." 1 *Wharton's Criminal Law*, sec. 26 at 122–26 (14th ed. 1978) (footnotes omitted).

We agree with the court of appeals that the state has not proved that defendant's conduct was a substantial factor in causing Dreyer's death. There is no testimony in the record from which the jury could have reasonably inferred that had more than two aides or one nurse been available for the supervision of residents on 1 North, Dreyer could not have wandered away undiscovered. Rose Marie Lietz testified that making rounds during the night shift means seeing "each patient at least every two hours." Although the jury may have inferred from this testimony that such a bed check once every two hours during the night of February 7, may have revealed Dreyer's absence sooner than it actually was discovered, the record is barren concerning whether it would have prevented his death. As the court of appeals noted, there is no testimony in the record concerning how quickly Dreyer died when exposed to the temperatures of between

8° and 15° F. The stipulation of the parties, stating that the death occurred between midnight and 3:00 a.m., when aide LaVonia Woods testified that she had assisted Dreyer approximately twenty minutes before midnight, indicates that Dreyer's death may have occurred rather quickly. This would show that even had the ideal two-hour bed check been possible with sufficient staffing, Dreyer may have wandered outside and died of exposure within the two-hour interval between bed checks.

The testimony of aide Woods is also insufficient. Woods testified that she used the following routine on unit 4 North:

"I didn't have time to do anything because when I got to 4 North you just go through, you know, you check— You wouldn't get through the whole floor, so you just go and check and see, to peek in the room and see if each patient is in their bed."

Thus, it is not clear that the shortage of staff on 1 North prevented Woods from doing anything more than "peeking" into each room, since this testimony concerns Woods' routine on 4 North. Woods' testimony concerning her routine on 1 North, the unit Dreyer occupied, is as follows:

"As an aide there on 1 North, and any floors, 1 North, when you first get on the floor you go—you check each— you check the rooms. If there's anybody out in the hallway or wandering around or walking when you hit that floor, you go and check to see what's wrong. In the first place, at that time of night patients usually be in bed."

It is not clear from Woods' testimony whether "checking" a room consists of merely peeking into the room from the doorway, as she did at Dreyer's room. If this was in fact the routine followed by Woods, it is also not clear whether this cursory check of the unit resulted from the staffing shortage and Woods' resulting inability to perform her

duties as thoroughly as she would have had more staff members been available.

The state argues that the jury reasonably inferred that had three aides been present on 1 North for the duration of the shift on the night Dreyer died, one could have monitored the halls and doors while the others made more careful checks of the rooms. Therefore, the state asserts that the jury inferred that even if Dreyer had managed to slip out, his departure would have been promptly observed by the aide watching the hall. However, there is no testimony in the record that this proposed routine would have been followed by the staff on 1 North had more aides and nurses been available. Also, there is no testimony concerning the physical layout of the unit and whether or not it was possible for a resident to somehow walk away unobserved even with an aide monitoring the hall. Therefore, we believe that the inference that Dryer would have been observed, based upon an inference that the staff would have utilized this routine, is too speculative to support Serebin's conviction for homicide by reckless conduct.

"[I]t is settled law in all jurisdictions that criminal agency must be shown beyond a reasonable doubt; it cannot rest upon conjecture or speculation." *Fine v. State,* 193 Tenn. 422, 428, 246 S.W.2d 70 (1952).

Accordingly, we find the record insufficient to sustain Serebin's conviction for homicide by reckless conduct.

## II.

## WAS THE EVIDENCE SUFFICIENT TO SUPPORT SEREBIN'S CONVICTION OF TWELVE COUNTS OF ABUSE OF NURSING HOME RESIDENTS?

Initially, we note that Serebin was convicted of permitting the personnel at Glendale to neglect patients be-

tween about December 20, 1975, and about June 30, 1976. Serebin argued at the court of appeals level that these twelve counts of abuse cannot be sustained, because he was not the official designated administrator during part of the time in which the offenses took place.

This claim is without merit. Section 940.29, Stats. 1975, provides in part,

"Any person in charge of or employed in any of the following institutions who abuses, neglects or ill-treats any person confined in or an inmate of any such institution or who knowingly permits another person to do so may be fined not more than $500 or imprisoned not more than one year in county jail or both:

". . .

"(7) A nursing home as defined in s. 50.02."[3]

Quite obviously, Glendale is one of the institutions embraced by the coverage of sec. 940.29.

The uncontradicted testimony of several witnesses reveals that in late February or early March of 1976, Rebecca Ellenson was appointed administrator of Glendale, while the defendant took a temporary appointment as administrator of the Brown Deer Bayside Nursing Home, also owned by the owners of Glendale. However, we do not find it critical that Ellenson, and not the defendant, was the administrator for part of the time during which these offenses occurred. The statute encompasses any person in charge of or employed in a nursing home. The evidence shows that Serebin continued in a supervisory role at Glendale even after Ellenson was named administrator.

---

[3] The successor statute contains substantially the same language, although the penalty has been increased. The present statute provides in pertinent part: "Any person in charge of or employed in any of the following facilities who abuses, neglects or ill-treats any person confined in or a resident of any such facility or who knowingly permits another person to do so is guilty of a Class E felony: . . . (7) A nursing home as defined in s. 50.01(3)."

For example, Darla Senn, the state nursing consultant, testified that she dealt with Serebin periodically between March and June of 1976, discussing conditions and code violations at Glendale with him. Arlene Kopshe, a state-employed social worker who supervised the placement of mentally retarded individuals in nursing homes, testified that in March of 1976, Serebin told her that he was assisting Ellenson, who was acting administrator of Glendale. Serebin also told Kopshe that he would be attending a meeting Kopshe had scheduled concerning care plans at Glendale, because he was still responsible for the nursing home. Serebin testified at trial that Kopshe was incorrect concerning his statements.

Several nurses testified that Serebin was often present at Glendale between February and June of 1976. The defendant himself testified that he was at Glendale approximately three times a week while Ellenson was administrator. He had previously stated at the John Doe proceeding, when asked if he returned to Glendale every day,

"I don't know whether I returned every single day, but I checked in usually by telephone and asked if there was any help that they needed, and on occasion went down there in the evening to, you know, to assist in whatever I could."

He also stated that he assisted Ellenson in whatever way he could. Ellenson and a nursing director testified that Glendale's weekly department-head meetings were not held unless the defendant was able to attend.

As we noted above, the function of the jury is in weighing the credibilty of the witnesses. *Fells v. State,* 65 Wis. 2d 525, 529, 223 N.W.2d 507 (1974). In this case, the jury was justified in concluding that the defendant retained his supervisory capacity at Glendale even when he was not designated as the official administrator. Therefore, the first element of sec. 940.29, Stats., that the

defendant was in charge of or employed in Glendale, has been satisfied.

The jury was instructed that the state must prove beyond a reasonable doubt that the defendant knowingly permitted the personnel to abuse, neglect, or ill-treat the residents at Glendale. *See,* Wis. J I—Criminal 1270 (1974). The state has argued that Serebin, as the person in charge of Glendale, followed directions from the owners of the nursing home concerning the available budget and made decisions to cut the staff, as well as the food given to the residents. The state maintains that as a result of Serebin's decisions, the patients could not be and were not cared for adequately, nor given sufficient food, which resulted in bedsores, or decubitus ulcers, and weight loss. Serebin was made aware of these problems by the staff, yet permitted this neglect to continue by enforcing the staffing and feeding policies he had adopted. Therefore, the state asserts that the evidence is sufficient to find the defendant guilty of abuse of inmates.

Initially, we note that the state must prove that the victims were inmates at the Glendale Convalescent Center. Serebin has not challenged this evidence. We next note that a number of patients with whose neglect Serebin was charged suffered from bedsores. The state introduced testimony from experts on nursing practices and education, including one expert who specialized in skin care and another who specialized in gerontological nursing, who testified that the major cause of bedsores is pressure which results if there are not enough well-trained staff available to "turn" patients. In other words, bedridden patients or those confined to wheelchairs should not remain in the same position for more than two hours. The experts testified that factors which contribute to this major factor include general malnutrition, especially protein deficiencies, and the patient's own incontinence, which may result in soiled, macerated skin

and causes erosion of the skin and lesion formation. One of the state's experts testified that in cases of patient incontinence, prompt cleansing of the skin is required in order to prevent bedsores. That same expert also stated that a nutritious, high-protein diet is helpful in the prevention of bedsores as well. The basic thrust of all three experts' testimony was that the prevention of bedsores is possible with sufficient nursing care and that the prevention of such sores is the responsibility of the nurse because of the frequency of the nurse's contact with the patients.

The record also indicates that nurses from Glendale testified that they agreed with the expert's testimony concerning the prevention of bedsores. Two nurses from Glendale testified that it was standard nursing practice to reposition bedridden residents every two hours. Therefore, we believe that the jury could have reasonably concluded that the Glendale staff knew of the proper treatment to be utilized in order to prevent bedsores.

There is evidence in the record that prior to the staff reduction in December of 1975, the director of nursing and several other members of the nursing staff informed Serebin that,

". . . . if we did not have adequate staff we would have less time to walk our patients, we would not be able to feed them promptly, we would not be able to toilet them promptly. More patients would have to remain in bed and we would have less time to do adequate perineal care [care of the genital area] and consequently our patients would be subjected to the possibility of getting a more skin breakdowns [sic], more contractures, and when skin breakdown and bacteria gets into you, you have bed sores or decubiti."

The record is also replete with testimony concerning what occurred following this staff reduction. Several nurses testified that the residents could no longer be repositioned every two hours and that the staff had to "deter-

mine who would suffer the least" by being left in bed instead of being taken out of bed to sit or walk. Both of these conditions were contrary to the practices required by the Wisconsin Administrative Code.[4] Often the heavy residents were left in bed all day, since it required more than one staff member to assist those residents, and the testimony indicates that the staff members simply were not available. There is also testimony that incontinent patients were not promptly cleansed.

Added to this, nurses testified that following the staff cuts, the staff was not available to feed patients who required feeding before their food became cold. Nor

[4] The relevant portions of the Wisconsin Administrative Code which deal with nursing homes read as follows: "H 32.11 *Restorative nursing care*. (1) *Active program*. There shall be an active program of restorative nursing care directed toward assisting each patient to achieve and maintain the highest level of self-care and independence. . . . (d) Nursing personnel shall be taught restorative nursing measures and shall practice them in their daily care of patients. These measures include . . . 2. Encouraging and assisting patients to change positions at least every 2 hours day and night to stimulate circulation and prevent decubiti and deformities; 3. Make every effort to keep patients active and out of bed for reasonable periods of time, except when contraindicated by physician orders, and encouraging patients to achieve independence in activities of daily living by helping the patient carry out self-care activities, transfer and ambulation activities. . . ."

These provisions were effective from December, 1974, through February, 1977. The present code provisions read as follows: "HSS 132.60 *Resident care*. (1) *Individual care*. Unless it is in conflict with the plan of care, each resident shall receive care based upon individual needs. . . . (b) *Decubiti prevention and position change*. Nursing personnel shall encourage and assist bedfast residents to change positions at least every 2 hours day and night to stimulate circulation and shall provide additional decubiti (bedsores) prevention measures as necessary. (c) *Basic nursing care*. . . . 3. Each resident shall be encouraged to be up and out of bed as much as possible, unless otherwise ordered by a physician."

could they observe patients who were able to feed themselves closely enough to be sure that those residents ate adequately. The record also indicates that at the time of the staff reduction, food portions were reduced. The procedure for serving meals was changed as well. Prior to December of 1975, the food was sent to the various units on large hot food carts, with trays filled with large quantities of various items which the staff served onto the patients' trays. Thus, the staff could determine the size of the portions being served to the individual patients, and the food remained warm in the food carts. After the staff reduction, the food was sent up on individual trays to be distributed to a designated patient, and the food carts were no longer available. Thus, the staff had no control over the size of the servings being given to the residents, and the food often became cold before the patients could be fed. As we noted above, the portions also became smaller. The record indicates that the staff complained of this to Serebin, who told them to order supplemental feedings or get a doctor's order for supplemental feedings. However, two nurses testified that when aides were sent down to the kitchen for supplemental feedings, they often returned and said that none were available. Staff members also testified that they told Serebin that there was not enough food on the trays and that the patients were losing weight. To corroborate these complaints, they showed him a list of patients who had lost a substantial amount of weight. Once again, Serebin told the nurses to call the patient's doctor and get an order for supplemental feedings.

One nurse testified that employees used their own money to buy snacks from the vending machines to supplement the residents' diets or brought snacks from home. Another testified that prior to December of 1975, kitchenettes on the units contained snack food for the residents on regular diets, which disappeared following the staff

and food reductions. After that time, only patients with a doctor's order for snacks got them. The nurse stated,

"All that was there was what the Dietary Department would bring to the floor at about 7:00 o'clock at night. Those were labeled for certain people. They had to have a doctor's order that said they could have an h.s. snack, h.s. meaning bedtime or before bedtime. So people without that order would see that given out but they couldn't have any. It was difficult."

As we noted above, many staff members complained directly to Serebin concerning the insufficient portions of food and the simultaneous weight loss of the residents. In section I of this opinion, we noted that the staff also complained to Serebin concerning their inability to care for the patients because of their reduced number. Finally, we note that numerous staff members made notes on the 24-hour reports, which Serebin testified he reviewed, concerning their inability to promptly reposition and cleanse incontinent residents, and the bedsores which simultaneously appeared.

When we review the evidence concerning the twelve residents whom Serebin was convicted of abusing, we note that the testimony of the nurses indicates that six were incontinent, and one suffered from multiple sclerosis and required regular cleansing. The testimony also reveals that following the December staff cuts, four of the incontinent patients who entered Glendale without bedsores developed them, while the remaining incontinent patient and the patient with multiple sclerosis, both of whom had entered with small bedsores, developed more extensive ones.[5] The record indicates that most of these patients were left in bed or in wheelchairs for long periods of time without cleansing because of the lack

---

[5] Regarding one of these patients, one nurse testified that she observed no change in skin condition, while three testified that they observed the appearance of bedsores.

of personnel available to reposition them or assist them in moving about.

Of the incontinent residents, one required feeding because of partial paralysis. The testimony indicates that this patient was often not fed until his food became cold and that he lost weight. Another incontinent patient lost weight, although it is not clear from the record whether or not he required assistance when eating.

The testimony indicates that the remaining five residents whom Serebin was convicted of abusing suffered from weight loss between December of 1975 and June of 1976. The testimony also reveals that some of these residents complained of being hungry during this period. The testimony concerning the weight loss consisted in some cases of the actual loss of pounds; the other testimony was in the form of the change in physical appearance of the residents. This included the nurses' observations of clothing becoming too loose, sunken cheeks, etc.

Wisconsin Jury Instruction—Criminal 1270 defines abuse, neglect, or ill treatment as follows:

"The phrase 'abuse, neglect, or ill-treat' includes any act or failure to act which causes suffering, misery or physical harm to a person confined." (Footnote omitted.) [6]

Utilizing this definition, we find there is substantial evidence in the record by which the jury could have found Serebin guilty of permitting the abuse or neglect of these twelve residents. Viewing the evidence most favorably to the state and the convictions, the record contains an overabundance of testimony from the staff concerning bedsores, which clearly may be characterized as an act of

---

[6] This definition is taken from the following sources: 1 *Words and Phrases*, "Abuse," at 333–35 (1964); 28 *Words and Phrases*, "Neglect," at 495 (1955); *Webster's Third New International Dictionary* 8, 1127, 1513 (unabridged ed. 1961); and 1. C.J.S. *Abuse* at 402 (1936).

physical harm; and weight loss, which may be deemed suffering. The record also contains testimony from which the jury could have inferred that these conditions resulted from Serebin's decision to reduce the number of staff per unit and shift, yet to continue admissions of new residents. The testimony of the staff reveals that they knew of the proper care required by residents, such as repositioning and cleansing, but that the reduced number of staff members made performance of these tasks virtually impossible. The testimony also reveals that the food portions were reduced, and residents subsequently lost weight. Numerous witnesses testified that the defendant was informed of these conditions, yet took no measures to correct them. The jury obviously considered the credibility of the witnesses, studied the evidence presented, and found Serebin guilty. We do not find that the evidence was so lacking in probative value that no jury could have found guilt beyond a reasonable doubt. *State v. Alles,* 106 Wis. 2d at 381–82. Accordingly, we reverse the court of appeals on this conviction.

We note that the court of appeals reversed this conviction because it observed that none of the experts had examined any of the twelve residents with bedsores or weight loss, nor had any expert given an opinion on a specific cause for a specific resident's weight loss or bedsores, nor had any expert given an opinion as to whether these conditions were due to Serebin's neglect. *State v. Serebin,* 114 Wis. 2d at 319. The court of appeals compared this case to a medical malpractice case and concluded that the state's use of experts ultimately allowed the jury to rely on its own common knowledge in order to draw a reasonable inference from circumstantial evidence, similar to the application of *res ipsa loquitur.* *Id.* at 319, citing *Kelly v. Hartford Casualty Insurance Co.,* 86 Wis. 2d at 134–35.

We disagree with the court of appeals' analysis. Concerning expert testimony, this court has stated the following:

"Expert testimony should be adduced concerning those matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study or experience." *Payne v. Milwaukee Sanitarium Foundation, Inc.*, 81 Wis. 2d 264, 276, 260 N.W.2d 386 (1977) (footnote omitted). *See also, Froh v. Milwaukee Medical Clinic, S.C.*, 85 Wis. 2d 308, 318, 270 N.W.2d 83 (Ct. App. 1978).

Obviously, the jury did not require expert testimony concerning the causal connection between the weight loss and the reduction of food portions and number of staff available to assist the residents in eating. Utilizing common knowledge, a reasonable juror is able to infer that weight loss, especially when accompanied by complaints of hunger, is due to insufficient food intake. Therefore, the jury was entitled to reasonably conclude that Serebin's reduction of the residents' diets and his cut in the number of staff available to feed the residents caused the weight loss.

Concerning the causal connection between the reduction of the staff and the residents' bedsores, we find that the experts' testimony addressing the need to reposition patients *every two hours* was most likely outside the jurors' common knowledge. Section 907.02, Stats., provides,

"**Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Although a reasonable juror might realize that prolonged periods of remaining in one position may cause pressure

which results in bedsores, most jurors would not know the exact time period within which a person could remain in one position without suffering such effects. Therefore, the experts' testimony concerning the need for repositioning every two hours, or the potential risk of bedsores without such repositioning, was sufficient without the need of an examination of the individual resident, or an ultimate opinion as to whether the bedsores were caused by Serebin's staff reduction. The jury could reasonably infer that the lack of staff available to reposition the residents caused the bedsores. Although an opinion or inference on an ultimate issue is admissible under sec. 907.04, Stats., this is not a case where the inference of causation between the staff cut and bedsores is

" 'so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman . . . that [the expert's] opinion or inference will probably aid the trier in his search for truth.' " *Cramer v. Theda Clark Memorial Hospital,* 45 Wis. 2d 147, 150–51, 172 N.W.2d 427 (1969), citing McCormick, *Evidence,* sec. 13 at 28–29 (1954).

Consequently, we hold the evidence sufficient to sustain these convictions and reverse the court of appeals.

In addition to the above two issues, the defendant raised ten other issues at the court of appeals. Because of its disposition of the case on the sufficiency of the evidence, these other issues were not considered by the court of appeals. Therefore, it is appropriate to remand this case to the court of appeals for consideration of the unresolved issues as they relate to the misdemeanor conviction. *State v. Marshall,* 113 Wis. 2d 643, 656, 335 N.W.2d 612 (1983) ; *State v. Derenne,* 102 Wis. 2d 38, 48, 306 N.W.2d 12 (1981) ; and *State v. Bettinger,* 100 Wis. 2d 691, 699a–699b, 303 N.W.2d 585 (1981).

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part, and the cause is

remanded to the court of appeals for further proceedings consistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. (concurring). I join the court's opinion. I write separately, as I have previously, to comment on a recurring problem in appellate practice, namely, how appellate counsel and this court should handle issues presented to the court of appeals but not decided by that court. See *State v. Lossman*, 118 Wis. 2d 526, 547, 348 N.W.2d 159 (1984), and cases cited therein.

In this case, the court does not address issues left unresolved by the court of appeals. It remands the issues to the court of appeals. See pp. 862, 863.

In some cases in the past, we have decided the unresolved issues. In other cases in the past, we have remanded the unresolved issues to the court of appeals. See *State v. Lossman, supra.* Ordinarily the court of appeals decides these issues on the briefs previously submitted to that court and available to this court.

We have not explained why we take one approach or the other. Counsel are unable to predict whether this court will decide the "undecided" issues or remand them to the court of appeals. Counsel therefore are uncertain whether to raise and brief again these unresolved issues in this court.

If the issues have been briefed either in this court or the court of appeals and counsel are willing to rely on the briefs, I would prefer, in the interest of judicial economy, speedy resolution of appeals, reduced costs to the litigants, and finality of decisions, that this court decided the unresolved issues. I write, as I did in *State v. Lossman, supra,* to call counsels' attention to take care in their petitions for review and in their briefs and oral arguments in this court to consider which court should decide the unresolved issues.

STEINMETZ, J. *(Dissenting in part; concurring in part.)* I agree with the majority in reversing the court of appeals as to the convictions for abuse of inmates of an institution, party to a crime and holding the evidence sufficient to sustain them. However, I dissent from the majority in affirming the court of appeals which reversed the conviction of the defendant for homicide by reckless conduct arising from a resident's death while the defendant acted as administrator of the Glendale Convalescent Center. As to that conviction, the majority finds the evidence insufficient in demonstrating that the defendant's actions were a substantial factor in causing Bruno Dreyer's death.

The majority cites the standard of review to be applied in considering the conviction as stated in *State v. Alles,* 106 Wis. 2d 368, 376–77, 316 N.W.2d 378 (1982), as follows: " 'the jury verdict will be overturned only if, viewing the evidence most favorably to the state and the conviction, *it is inherently or patently incredible, or so lacking in probative value that no jury could* have found guilt beyond a reasonable doubt.' " However, after stating the standard for reviewing the verdict, the majority never applies it to the facts which it reviews and on which the jury based its conclusion. Even though it is not stated, the majority must have considered Bruno Dreyer's walking out of the building to his death as an intervening fact which relieved the defendant of any cause he had in the death. Based on this record, I disagree with the majority's analysis.

Section 940.06 (2), Stats. (1975), states:

"Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and willingness to take known chances of perpetrating an injury. . . ."

That was what the defendant did in placing budget considerations over the safety and protection of the residents. After being warned by his staff of the needs for more personnel for the number of residents, he not only refused to add employees but continued to accept additional residents which increased the hazard. The majority concedes: "Serebin's main concern was operating within the budget." (P. 844.) That means that his secondary concern was for the residents and when having been warned of potential consequences by his staff and by the state, he continued to place budget considerations over the welfare of the residents and that was the reckless conduct which caused the inability of the limited staff to properly supervise the residents in order to guard against what in fact occurred.

The evidence the jury considered in arriving at the conviction and which the majority must have found led to an inherently or potentially incredible verdict was:

(1) A health facility surveyor for the state found staffing deficiencies at Glendale "of such character as to jeopardize the health, safety, and welfare of the patients" and she ordered Glendale to correct these deficiencies. That finding and order were issued a year before Mr. Dreyer's death.

(2) Twelve staff nurses testified that after the previous warning from the state, the defendant reduced, not increased, the nursing staff further even though they specifically told him "these reductions would make it impossible to supervise and care for patients, especially those who had a tendency to wander around and try to leave the building." (P. 845.)

(3) One nurse testified she resigned from Glendale twice in 1975 and 1976 because of insufficient staffing and she spoke with the defendant weekly about the inadequate care and supervision the residents were receiving due to the insufficient staffing.

(4) Two nurses testified they asked defendant to employ more staff or stop admitting patients. He told one of them he had to keep admitting residents and that hiring more staff would exceed his budget.

(5) Approximately one week before Mr. Dreyer's death, a nursing consultant for the state submitted a correction order to the defendant characterizing the understaffing as "an occurrence which endangered the patients' health, welfare and safety."

The majority concedes the evidence from which the jury could have concluded the defendant's actions evinced reckless conduct is overwhelming.

"Although Serebin denied his participation in staffing decisions at trial, the testimony of other witnesses from which the jury could have concluded that Serebin's actions evinced reckless conduct is overwhelming. The above evidence indicates that Serebin was repeatedly warned by his own staff and state officials that the insufficient staffing created a situation in which patients did not receive adequate care and supervision and especially that wandering residents could not be adequately watched. From this, a reasonable jury could have inferred that Serebin's actions regarding staff cuts and continued admissions created a high probability of death or great bodily harm. For example, if residents left the building and were exposed to the elements during harsh weather, or became ill or injured and required prompt medical attention, the lack of staff could aggravate those conditions, resulting in death or great bodily harm. It is common knowledge that elderly patients require close supervision and care because of the physical and mental conditions which often accompany the aging process. The evidence indicates that Serebin knowingly allowed the probability of such dangers to exist, from which the jury could infer a conscious disregard for the residents entrusted to his care and a willingness to take known chances of risks. The jury, therefore, could have concluded that in acting as he did, Serebin should have realized that he created a situation of unreasonable risk

to the residents at Glendale. *See, Hart v. State,* 75 Wis. 2d 371, 397, 249 N.W.2d 810 (1977)." (Pages 845–846.)

The majority finds, however, that his reckless conduct was not shown to be a substantial factor in producing Mr. Dreyer's death. A licensed practical nurse and two aides were assigned to Mr. Dreyer's ward, 1 North, but the aides were not assigned to that ward for the whole night. The same nurse was in charge of other units as well. In the three units for which the nurse was responsible there were 200 residents. Before the budget cuts three aides, not two, worked on 1 North and the nurse on the night shift was only responsible then for 1 North and one other unit, not two.

The doors leading from 1 North to the outside could not be kept locked because it was an emergency exit. There was an alarm installed on one door to alert the staff that it was opened. "However, the sliding glass doors through which Dreyer apparently left had no such alarm." (P. 847.) In other words, for the sake of a budget saving by not placing an alarm on the sliding doors or one attendant to watch the hall while the other went into residents' rooms, Mr. Dreyer wandered out of the building without notice and froze to death. The jury must have believed that there was a cause and effect between the defendant's conduct and Mr. Dreyer's wandering out of the building and freezing to death. I agree. I do not find that causal connection to be inherently or patently incredible or lacking in probative value as the majority must find.

Wisconsin Jury Instruction—Criminal 1160, dealing with homicide by reckless conduct which was given to this jury and quoted with approval by the majority, states in relevant portions to the issue of cause the following: "That is to say, that it was a factor actually operating and which had substantial effect in producing

the death as a natural result." (P. 849.) The defendant's budget constraints and failure to hire necessary staff to care for and to supervise the residents, including Mr. Dreyer, "was a factor actually operating and which had substantial effect in producing the death [of Mr. Dreyer] as a natural result."

On page 851 of the majority opinion, the majority uses conjecture to state that even if an aide monitored the hall while the others checked in the rooms, Mr. Dreyer still might have frozen. The reality is that there was no aide to watch the halls and there was no alarm on the sliding doors. We do not know what the population of residents was before the budget cuts so it is not relevant to know whether aides monitored the halls then. We do know, however, that the defendant continued to cut the staff and to increase the number of residents. To me, that is cause and effect, especially since as an administrator he had been told by his chief nurse that "if you do not have enough registered nurses and licensed practical nurses you do not have the supervision of the patients to see that their care is done and to supervise your wanderers. . . . [*who*] *have a tendency to try to get out of the building.*" (Emphasis added.)

The defendant had been warned by state supervisors of care facilities, by his own staff nurses and by Glendale employees of the consequences of inadequate staff and of increasing the number of residents. He had been warned that his supervision was so inadequate as to be reckless and a result of that recklessness would be wanderers leaving the building. That is what occurred.

Justice Abrahamson in a concurring opinion decries the fact that this court is not consistent as to whether we will decide the "undecided" issues or remand them to the court of appeals. She states that therefore counsel are uncertain whether to raise and brief these unresolved issues in this court. This decision must be made by this

court on a case-by-case basis and no general rule can be established. We are well aware that the court of appeals is inundated with appeals and that if appropriate, we will decide all issues bringing finality to the case. However, we are mindful that decisions of the Supreme Court are published and have a precedential status and, therefore, we have an obligation not to fill the law books with matters that are not truly of precedential value. The court of appeals in deciding issues before it may or may not publish a decision and unless published, the decision has no precedential value.

In the present case the state petitioned this court for review and stated the two issues as being:

"(1) Was the evidence sufficient to support Serebin's conviction of homicide by reckless conduct arising from the death of a resident of a nursing home which Serebin administered?

"(2) Was the evidence sufficient to support Serebin's conviction of twelve counts of abuse of residents of institutions?"

This court has decided both of those issues. In addition, the defendant in opposition to the petition for review stated another issue which had several sub-challenges. That issue was: "Were the constitutional rights of the defendant flagrantly violated during the prosecution?" The sub-challenges under that issue were:

(1) The number of charges brought against the defendant, 58 misdemeanor violations and one felony, was oppressive and unnecessarily excessive.

(2) The defendant was not allowed to present any evidence at the April 14–15, 1980, hearing in support of his motion concerning selective discriminatory enforcement.

(3) The nursing home records which were introduced against the defendant were seized without a warrant and the defendant's motion to suppress was denied.

(4) The defendant's motion to change venue was summarily denied.

(5) The trial court refused to grant the defendant's motion to waive a jury trial.

(6) Although the voir dire examination was not reported, the prosecution used it as a vehicle to appeal to the passions of the jurors and to infect them with erroneous and inadequate legal standards.

(7) The defendant's attempt to introduce polygraph testimony to support his defense that he had no knowledge of neglect of patients or that Mr. Dreyer was unattended on the night he eloped was barred by the court.

(8) The prosecution introduced testimony which brought collateral issues before the jury (including material which would incite feelings of religious and racial prejudice).

(9) The defendant was not allowed to introduce black character witnesses on his behalf before a jury that was composed of many black citizens.

(10) The prosecutor made remarks during opening and closing statements imploring the jury to consider those unheard voices of the aged who could not come into the courtroom and made an appeal that a conviction was expected as a community responsibility.

The defendant is entitled to have all of these claims of constitutional denial resolved; however, they were not presented to this court in detailed oral argument consistent with our usual practice, since the two issues before this court were as a result of the prior determination by the court of appeals as to the sufficiency of evidence.

The court of appeals in ruling on the remaining issues stated above may or may not consider them as matters deserving of publication and of precedential value in the context of the record in this case and for that reason alone, it is appropriate for these issues to be returned to that court for resolution.

I would reverse the court of appeals as to both the reckless homicide and abuse of inmate's convictions and remand the cause to the court of appeals for determination of the other unresolved issues.

I am authorized to state that JUSTICE ROLAND B. DAY joins in this dissenting and concurring opinion.

I am also authorized to state that JUSTICE WILLIAM G. CALLOW joins that portion of this concurring opinion dealing with sending the issues back to the court of appeals for resolution.

I am also authorized to state that JUSTICE WILLIAM A. BABLITCH joins in the dissenting portion of this opinion.