BEAVERS, Plaintiff in error, v. STATE, Defendant in error.

*No. State 160.   Argued April 3, 1974.—Decided May 7, 1974.*
(Also reported in 217 N. W. 2d 307.)

598

For the plaintiff in error there was a brief by *Randall E. Morey* and *Whelan, Morey, Morey & Ricci, S. C.*, all of Mondovi, and oral argument by *Randall E. Morey*.

For the defendant in error the cause was argued by *Michael R. Klos*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

CONNOR T. HANSEN, J. The following issues have been raised on appeal:

I. Whether there was sufficient evidence to sustain a conviction for first-degree murder?

II. Whether the state improperly anticipated and remarked upon the defendant's defense in its opening statement to the jury?

III. Whether there was sufficient evidence to sustain the jury's finding that defendant was free of mental disease or defect?

IV. Whether the trial court erred in refusing to permit defense counsel to use certain charts to assist him in making his opening statement to the jury in the sanity phase of the trial?

V. Whether the defendant's right to a fair trial was denied because of pretrial publicity?

I. *Sufficient evidence of guilt.*

The defendant argues that the defendant did not intend to kill his wife but rather sought only to "shut her up." He also seeks to discredit the adequacy of the autopsy and thereby minimize its conclusions. Finally, it is suggested that the victim could have died by swallowing her tongue.

These arguments are proper considerations for the jury in its determination of the defendant's guilt. However, the rule is well established that ". . . only if the evidence

that the jury has relied upon is inherently or patently incredible or insufficient will this court substitute its judgment for that of the jury." *Baldwin v. State* (1973), 59 Wis. 2d 116, 119, 207 N. W. 2d 630.

In *State v. Chacon* (1971), 50 Wis. 2d 73, 74, 183 N. W. 2d 84, this court stated that it would not ". . . retry the case on the record to see if each member of this court is convinced of the guilt of the defendants beyond a reasonable doubt. . . ."

In *Fox v. State* (1973), 60 Wis. 2d 462, 466, 210 N. W. 2d 722, this court very recently explained:

". . . The test of the sufficiency of the evidence to convict is, on appeal, whether the evidence adduced, believed and rationally considered by the trier of fact was sufficient to prove the defendant's guilt beyond a reasonable doubt. Insufficiency of the evidence to warrant conviction requires holding that the evidence, when considered most favorably to the state and the conviction, be so insufficient in probative value that it can be said as a matter of law that no trier of fact acting reasonably could be convinced to that degree of certitude which the law defines as 'beyond a reasonable doubt.' "

We deem the testimony and proof adduced at trial to be sufficient credible evidence upon which the jury could find the defendant guilty beyond a reasonable doubt.

II. *Opening statement.*

Prior to trial, the court was asked to rule on the permissible scope of the opening statements which would be made to the jury. Defense counsel objected to the fact that the prosecution would anticipate the defendant's defense that the victim had, in fact, fallen down the stairs. The prosecution argued that the defendant's statements to the sheriff were admissions and properly admissible into evidence, and as such, they could be referred to in opening statements to the jury. The trial court denied the defendant's motion to restrict opening statements to

exclude reference to the defendant's statements of the manner and way in which his wife had died.

The prosecution in its opening remarks to the jury reviewed the testimony that he intended to introduce as he called the various witnesses. In so doing, he explained the anticipated testimony of Sheriff Hoch which included the defendant's explanation to him concerning the circumstances of the victim's death. It was also explained that the sheriff would testify that the defendant changed his story upon subsequent questioning and admitted to having fought with his wife on the afternoon of the crime and choking her.

The defendant argues it was error for the trial court not to restrict the opening statement of the prosecution as requested, citing the following language from *Baker v. State* (1887), 69 Wis. 32, 40, 41, 33 N. W. 52:

"Exceptions were taken to remarks of counsel for the prosecution in opening and closing the case. In opening the case he stated, in effect, that the accused would introduce testimony touching the character of the complainant, and as to what he tried to prove upon the former trial; but, upon objection being made, the court promptly ruled that he must confine himself to stating to the jury the cause of the prosecution, but that he must not state the cause of the accused to the jury. This was certainly a sufficient protection to the accused from being prejudiced by anything thus stated. . . ."

In the instant case, the prosecution did not allude to what the defendant would introduce as evidence but simply explained its own evidence. It had been previously determined in a *Goodchild* hearing that the statements made by the defendant to investigating officers had been made voluntarily and were admissible in evidence. The opening statement of the prosecutor explained that the sheriff would testify about the statements made by the defendant in respect to how his wife had died. The sheriff did eventually testify about these statements.

This is not a situation where the prosecutor referred in his opening statement to matters which he could not, or did not, intend to prove. *(See:* Annot., *Reference by counsel for prosecution in opening statement to matters which he does not later attempt to prove as ground for new trial, reversal, or modification.* (1953), 28 A. L. R. 2d 972.

Nor is this a situation where the prosecutor commented upon the anticipated failure of the defendant to testify. It was clear from the defendant's version of his wife's death that he hoped the jury would believe his wife had fallen to her death. The state believed she was strangled. It is generally recognized that:

"The office or purpose of an opening statement is to advise the jury concerning the questions of fact involved, so as to prepare their minds for the evidence to be heard. . . ." 23A C. J. S., *Criminal Law,* p. 97, sec. 1085.

It is also recognized that:

"The prosecuting attorney should be allowed reasonable latitude in his opening statement, especially where the law on the subject is not so elementary that every lawyer should know it; but except in so far as the contents of his opening statement may be prescribed by statute or rule of court, its scope and extent are largely within the discretion of the trial court. It should be brief and general, rather than detailed, and should be confined to statements based on facts which can be proved and should not include facts which are plainly inadmissible, and which he cannot or will not be permitted to prove, or which he in good faith does not expect to prove. . . ." 23A C. J. S., *Criminal Law,* pp. 98–100, sec. 1085.

The defendant's statements to investigating officers were ultimately proven and the prosecutor's opening remarks in relation thereto were proper.

III. *Sanity.*

The defendant entered a plea of not guilty by reason of mental disease or defect, pursuant to sec. 971.06, Stats.

Again on this issue, counsel for the defendant presents to this court the same testimony and arguments which were rejected by the jury when it resolved the issue against the defendant and held him responsible for his actions. The proof of defendant's insanity at trial consisted of the testimony of Dr. Lorenz as supplemented by the Michigan and California reports of previous mental evaluations of the defendant, which we summarized as follows:

In 1956, the defendant was convicted of armed robbery in California and committed to the Atascadero State Hospital for observation. The psychiatric report signed by Dr. Leonard Liest diagnosed the defendant at that time as having a sociopathic personality disturbance, antisocial reaction.

In 1957, he was diagnosed by another California psychiatrist, Dr. Arnold Sheuerman, as having a schizophrenic reaction, mixed type, chronic, moderate, progressing. It was recommended at that time that he receive institutionalization because he was believed to be dangerous to himself and others.

While in California, another psychiatrist, Dr. John A. Malloy, also felt he had a schizophrenic reaction, mixed type.

In 1958, the defendant was charged with arson in Michigan. He was on parole from California at the time of this offense. He was incarcerated in Michigan and there received some psychiatric review. He was paroled from Michigan in 1962, married Sarah Ernst (victim) in 1963, and began to work regularly after 1964 in Winona, Minnesota.

In opposition to the testimony of Dr. Lorenz is that of the court-appointed psychiatrist, Dr. Chapman.

Dr. Chapman testified that it was his expert opinion, after having reviewed the defendant's history of mental problems and personally examining him, that he ". . . was not because of mental disease or defect lacking in

substantial capacity to appreciate the wrongfulness of his conduct." Dr. Chapman went on at length to explain the reasons for his conclusion. He was impressed with the defendant's improvement which was evident after his encounters with the law in Michigan and California. Chapman considered and evaluated the earlier psychiatric reports on the defendant, but pointed out that defendant had held steady employment after he was married in 1963.

Chapman explained that the defendant had an unfortunate childhood and had been faced with a great many social pressures. However, it was his opinion that the defendant was not schizophrenic, and while he was of borderline mental retardation, he was not substantially lacking in capacity by reason of mental defect to conform his conduct to the requirements of law. Thus, Chapman concluded that the defendant was not insane when he committed this crime.

In arriving at his expert opinion, Dr. Lorenz testified that he had also considered important the defendant's past history of mental treatment and the reports relevant thereto. Lorenz did not request psychological evaluations of his own but for purposes of his diagnosis relied upon those which had been ordered by Chapman. Lorenz diagnosed that the defendant had a ". . . character behavior disorder, antisocial personality type." He concluded that because of this antisocial personality, the defendant lacked substantial capacity to conform his conduct to the requirements of law. However, he also felt that the defendant was competent to stand trial and also testified on cross-examination that the defendant knew it was wrong to kill his wife.

The resolution of the extent to which the testimony of Dr. Lorenz may be considered to be in conflict with that of Dr. Chapman rests within the province of the jury.

In *Sprague v. State* (1971), 52 Wis. 2d 89, 99, 187 N. W. 2d 784, this court again stated the following rule:

"This court has held that it is the responsibility of the trier of fact to determine the weight and credibility of medical testimony on the issue of insanity and to determine whether the defendant has met the burden of proving he was insane. *State v. Bergenthal* (1970), 47 Wis. 2d 668, 178 N. W. 2d 16. Where there is sufficient credible evidence to support the finding of the jury, it will not be upset on appeal. *McCool v. State* (1971), 51 Wis. 2d 528, 187 N. W. 2d 206. . . ."

In *State v. Hebard* (1971), 50 Wis. 2d 408, 424, 425, 184 N. W. 2d 156, the court held that, ". . . [t]he conflict in expert testimony is apparent. The question of which experts were to be believed was for the jury to determine."

There was sufficient credible evidence to sustain the jury's finding that the defendant did not suffer from a mental disease or defect such that he lacked substantial capacity to conform his conduct to the requirements of law.

IV. *Charts.*

By stipulation, it had been agreed that the Michigan records and the California records of defendant's mental condition would be admitted into evidence. The jury read these statements at the beginning of the sanity phase of defendant's trial after opening statements had been made.

Defendant asserts error because he was not permitted to use a series of 10 charts in his opening statement. The details of the first six charts were taken from the Michigan and California reports. The other four charts contained items which were expected from the testimony of Dr. Lorenz. Defendant argues that he should have been permitted to use these charts "[i]n order to lead a lay jury through a maze of psychiatric terms, . . ."

The defendant sought the use of charts showing the various classifications of mental disorders. When the trial court was asked to permit the use of these charts in his opening statement the prosecutor objected and argued it was unfair to take the material contained in the charts out of the context in which they appeared.

The trial court recognized that photos and charts may be proper exhibits during a trial, but refused to permit the use of the charts in opening statements. The trial court advised counsel he saw no problem in using the charts during closing arguments.

In *Hernke v. Northern Ins. Co.* (1963), 20 Wis. 2d 352, 122 N. W. 2d 395, this court reviewed the trial court's refusal to permit the use of charts of body muscles and a model skeleton and, while this court was of the opinion that it would have been "preferable" for the trial court to have permitted the use of the exhibits, the refusal to do so was not prejudicial. It was recognized as follows:

"Almost all courts have recognized that whether demonstrative evidence is to be received rests largely in the discretion of the trial judge. *Walker v. Baker* (1961), 13 Wis. (2d) 637, 651, 109 N. W. (2d) 499; Gordon, Demonstrative Evidence, 32 Wisconsin Bar Bulletin (February, 1959), p. 11. It has been observed that many people learn and understand better with their eyes than they do with their ears. It would seem that the alignment of bones and muscles is sufficiently obscure to the average juror so as to make a visual demonstration helpful. *Smith v. Ohio Oil Co.* (1956), 10 Ill. App. (2d) 67, 134 N. E. (2d) 526." *Hernke, supra,* page 359.

The charts in this case were not comparable to the muscle charts and skeleton in *Hernke*. These charts were summarizations of the conclusions of various psychiatrists. Thus, defendant sought in part to emphasize conclusions reached in mental examinations conducted prior to trial. The refusal to permit the use of these charts in counsel's opening statement was not an abuse of discretion by the trial court.

V.  *Pretrial publicity.*

The defendant also argues that his due process right to a fair trial was violated in this case by pretrial publicity.

The defendant's preliminary hearing was held on July 27, 28 and 31, 1972.  Prior to the preliminary hearing, the defendant asked the trial court to close the hearing to the public and the press.  The trial court refused to do this, noting that, in addition to necessary witnesses and officers of the court, there was only one spectator and a reporter from Winona Daily News and one from the Cochrane-Fountain City Recorder.

Defendant primarily objected to two facts which were publicized in the newspaper.  One, that Loken's initial report listed the cause of death to be strangulation.  Two, that defendant had stated to investigating officers that his wife had fallen down the stairs and struck her head.  These facts were reported in the Winona Herald News on July 14 and 18, 1972, and the Eau Claire Leader on July 19, 1972.  On July 20, 1972, the trial court ordered the prosecutor and police and law officers of the county to refrain from making any extra-judicial remarks to the press or to anyone else concerning the case.  The court reiterated  this order when the preliminary hearing began.

After the preliminary hearing was held and prior to trial, defendant moved the court for a change of venue.  Primarily the affidavit said that extensive publicity throughout the county prevented the defendant from obtaining a fair trial.  Attached to the affidavit was the certificate of death.  Also attached to the affidavit were various news articles concerning the case.  The articles were from several newspapers such as the Cochrane-Fountain City Recorder, the Eau Claire Leader, Winona Daily News, and Buffalo County Journal.

On September 28, 1972, the trial court denied the defendant's motion for a change of venue. The court was cognizant of the publicity concerning the case, but said that, in view of the fact that defendant's statements to investigating officers had previously been ruled admissible, it did not feel that the nature of the reporting had been misleading, false or prejudicial.

The court observed that the news people and the public were not in heavy attendance. More importantly, the court noted with respect to the articles of the Winona Daily News that they were not headline in nature, but normally appeared on page three or deeper in the newspapers. Comparing this case to a recently much more publicized case in an adjoining county where a fair jury was selected, the trial court held that a fair, impartial and unprejudiced jury could be selected from Buffalo county with the aid of an extensive *voir dire*. Accordingly, the motion was denied, and the defendant claims this was error.

Defendant argues that the trial court improperly denied his motion for a change of venue and this deprived him of a fair trial. The record also contains several news articles which apparently were not submitted to the trial court to support the defendant's motion but which were apparently collected after trial.

Almost a century ago the United States Supreme Court recognized the problem of pretrial publicity and its potential effect on jurors when it said:

". . . In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. . . ." *Reynolds v. United States* (1878), 98 U. S. 145, 155, 156, 25 L. Ed. 244.

After recognizing the above-stated proposition, the United States Supreme Court, in *Irvin v. Dowd* (1961), 366 U. S. 717, 723, 81 Sup. Ct. 1639, 6 L. Ed. 2d 751, stated that "[t]his is particularly true in criminal cases." The court in *Irvin v. Dowd, supra,* further stated at page 723, that:

". . . To hold that the mere existence of any preconceived notions as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . ."

In *State v. Hebard, supra,* pages 426, 427, this court held:

"Relevant factors in determining whether a motion for change of venue should have been granted by a trial court include: the inflammatory nature of the publicity concerning the crime; the degree to which adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised; the amount of difficulty encountered in selecting the jury; the extent to which jurors were familiar with the publicity; the defendant's utilization of challenges, both peremptory and for cause, available to him on *voir dire;* the participation of the state in the adverse publicity; and the severity of the offense charged and the nature of the verdict returned. If there is a reasonable likelihood that a fair trial cannot be had, it is an abuse of discretion to deny a motion for a change of venue."

More recently, in *Tucker v. State* (1973), 56 Wis. 2d 728, 733, 734, 202 N. W. 2d 897, it was stated:

". . . Change of venue is a constitutional and statutorily guaranteed right where adverse community prejudice will make a fair trial impossible. A motion for change of venue is addressed to the sound discretion of the trial court. If the evidence on motion for change of

venue gives rise to a reasonable likelihood that a fair trial cannot be had, it is an abuse of discretion to fail to grant a change of venue. Where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the trial judge is to '. . . continue the case until the threat abates, or transfer it to another county not so permeated with publicity. . . .'

"While abuse of discretion is the test on appeal, an appellate court has '. . . the duty to make an independent evaluation of the circumstances. . . .' In making such independent evaluation, this court has listed the factors relevant in determining whether a motion for change of venue should have been granted, including: '. . . The inflammatory nature of the publicity; the degree to which the adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; the extent to which the jurors were familiar with the publicity; and the defendant's utilization of the challenges, both peremptory and for cause . . . the participation of the state in the adverse publicity . . . the severity of the offense charged, and the nature of the verdict returned.' "

This issue was also considered in *State ex rel. Hussong v. Froelich* (1974), 62 Wis. 2d 577, 215 N. W. 2d 390.

The trial court conducted a thorough and meticulous *voir dire* examination of the jury panel. Each juror was fully questioned about his exposure to pretrial publicity. Most of the jurors indicated that they had only read one or two articles on the case. The trial court was very careful to determine whether any potential juror had formed any opinion about the case or even discussed it with others. The panel was fully instructed that they must not consider any of the news articles as evidence, nor draw any conclusions about the case from them. Those who had made or expressed an opinion about the defendant's guilt were excused. Some of these jurors who were excused had read only one or two articles on the case and merely stated that they had formed an

opinion. Forming an opinion by itself does not indicate that one cannot fairly judge the defendant. The important thing is whether the opinion can be set aside and the defendant tried only on the evidence offered at trial. *Irvin v. Dowd, supra.* However, it is apparent that if there was the slightest doubt that a juror had an opinion and it might influence him, he was excused.

Defendant argues that of the prospective jurors remaining after many were excused to tend their farms, 65 had read news reports and 37 were excused. This is attributable to the fact that the trial court made painstaking efforts to obtain impartial jurors.

In examining the news articles, which the trial court considered when it denied the motion for change of venue, some are very general in nature, and some reported testimony which was elicited at preliminary hearing. There was little or no editorializing and the articles were not inflammatory or vituperative in nature. *See: Sheppard v. Maxwell* (1966), 384 U. S. 333, 86 Sup. Ct. 1507, 16 L. Ed. 2d 600. The articles appeared in several newspapers and it is, therefore, understandable that the jurors had not read them all or even a majority of them. One article, which appeared in the Eau Claire Leader-Telegram on August 2, 1972, explained some of the testimony presented at the preliminary hearing and referred to a statement "allegedly" made by the victim's mother, Mrs. Viola Ernst, to Deputy Sheriff Baertsch. Mrs. Viola Ernst did not testify at the trial, nor did Baertsch testify about this statement. We consider this single incident to be nonprejudicial.

We are of the opinion that the trial court was correct in determining that it could, through extensive *voir dire,* obtain a fair and impartial jury, and did so. The record in this case is well in excess of 3,000 pages and it is clear that defendant received a fair trial by an impartial jury.

*By the Court.*—Judgment and order affirmed.