**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Kenneth Paul MUETZE, Defendant and Appellant.**

**No. 14258.**

Supreme Court of South Dakota.

Argued April 18, 1984.

Decided May 22, 1985.

Rehearing Denied June 24, 1985.

Richard Dale, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Allen J. Eide of Gribbin, Burns & Eide, Watertown, for defendant and appellant.

MORGAN, Justice.

A grand jury investigated the death of Darwin Florey (Florey) and indicted Kenneth Paul Muetze (Muetze) for first-degree murder. Muetze was tried and convicted by a jury. He appeals that conviction. We affirm.

Florey's death was allegedly the culmination of a series of events that began on January 1, 1983, when Todd Florey (Todd), the victim's son, and a friend, Mike Friske (Friske), met Muetze in a Watertown, South Dakota, bar. Todd, Friske, and Muetze left the bar and went to Muetze's car where he opened his trunk and showed Todd and Friske a box of marijuana. Friske later broke into Muetze's car trunk, damaged the trunk cover in the process, and stole the marijuana. Todd then drove Friske to his pickup truck, which was parked at the Florey residence. Before Friske left for the evening, he left approximately one ounce of the stolen marijuana with Todd.

When Muetze and two companions, John Paulson (Paulson) and Brad Froke (Froke), discovered that the marijuana was gone, Paulson and Froke obtained a shotgun, the

eventual murder weapon, which Muetze apparently intended to use in order to intimidate Todd. Muetze and his companions then visited the Florey residence twice in the early hours of January 2, 1983. On Muetze's first visit, Florey gave him permission to search Todd's car for a fictitious set of lost keys. On the second visit, Muetze spoke to Todd and told him he had discovered evidence in Todd's car which indicated that the marijuana had been in that car. Muetze telephoned the Florey residence and spoke to Todd four times after the second visit. Todd testified that "[h]e [Muetze] said that he was going to get me and not only was he going to get me, he was going to get my family." Todd made arrangements with Friske to return the marijuana to Muetze. The marijuana fell into Froke's possession before it reached Muetze. Froke was subsequently arrested and the police confiscated Muetze's marijuana.

Several of Muetze's friends testified that at various times between January 1, the night Friske stole the marijuana, and January 26, 1983, the night of the murder, Muetze made threats against Todd and the Florey family. Muetze allegedly told at least two people that he was going to shoot the Floreys with the shotgun Paulson and Froke had obtained for him.

Todd eventually returned to Brookings and resumed classes at South Dakota State University. The night of the murder, Muetze, Paulson, Brenda Strohfus (Strohfus) and Brenda Matteson (Matteson) drove to Brookings, South Dakota, in Muetze's car. Todd testified that Muetze walked up to him in a Brookings bar that evening, grabbed him by the throat and requested payment for the damage to his trunk. Todd struck Muetze with his fist, breaking his glasses and cutting him over the eye. Todd then left the bar. As a result of the altercation, the bar management told Muetze and his companions to leave the premises. They drove around Brookings looking for Todd and when they did not find him they drove back to Watertown.

Between Brookings and Watertown, Muetze said, at least twice, that "he was going to kill Todd's parents...." Upon returning to Watertown, Muetze insisted they drive past Florey's house before going to the trailer that Muetze and Paulson shared. When they finally arrived at the trailer, Strohfus and Matteson waited in the car while Muetze and Paulson went inside. Muetze returned to the car with the murder weapon and told Strohfus and Matteson that he was going to Florey's by himself because he did not want anyone else involved. The two women left the car and entered the trailer.

Muetze returned to the trailer with the shotgun within a few minutes and said "I just blew old man Florey away...." He then ejected a spent shell from the shotgun. Analysis demonstrated that the shell was fired from the shotgun Muetze was carrying and that it had contained the type of rifled slug which killed Florey. Muetze and Strohfus then went to her apartment. Muetze cleaned himself off in Strohfus' bathroom and told her to empty her garbage because there were "blood and guts" in it that could be evidence against him. While in Strohfus' apartment, Muetze telephoned a friend and explained that he had killed Florey and needed an alibi. The following morning, on January 27, 1983, the police evacuated and surrounded the apartment building. Muetze surrendered and was taken into custody.

On January 28, 1983, Muetze made several discovery requests. A circuit court judge partially granted Muetze's requests and ordered the prosecutor to turn over a copy of the Department of Criminal Investigation's (DCI) report and a detailed summary or transcript of Muetze's January 27 conversation with the police. On March 7, 1983, Muetze made further discovery requests. The trial judge again granted a number of the requests and denied others. This appeal is based in part on the trial court's partial denial of Muetze's discovery requests. The relevant motions will be discussed below as they become pertinent.

A jury found Muetze guilty and he was sentenced to life imprisonment. He raises ten issues on this appeal: (1) whether a defendant is entitled, upon motion, to the investigating officers' original notes; (2) whether a defendant is entitled to any information the prosecution may have which might be used to impeach the credibility of prosecution witnesses; (3) whether a trial judge may refuse to admit testimony which alleges that a police officer instructed a witness not to cooperate with a court authorized defense investigator; (4) whether the appointment and the grant of additional funding for a defense investigator is within the trial court's discretion; (5) whether a trial judge may restrict the scope of voir dire by requiring the attorneys to question fifty-four prospective jurors simultaneously; (6) whether a trial judge may properly prohibit voir dire questioning on the prospective jurors' beliefs regarding drug users' propensity for violence; (7) whether the trial court erred when it refused to permit defendant's counsel to question a prospective juror, who admitted prejudice, on the juror's beliefs regarding the presumption of innocence and the burden of proof; (8) whether the trial court properly weighed the probative value against the prejudicial effect when it admitted colored photographs of the victim's body into evidence; (9) whether a trial court may prohibit a defendant's testimony regarding out-of-court statements made by prosecution witnesses; and (10) whether polygraph results or prior inconsistent statements, both of which discredit a prosecution witness, should be admitted into evidence in order to impeach the witness' credibility.

From almost the date of his appointment, defense counsel beset the trial court with an array of motions, the bulk of which were granted in full or in part. In the first two issues, Muetze attacks the denial of two of the discovery motions.

▮▮▮ Muetze first contends that a defendant is entitled, upon motion, to the original notes of the investigating officers. Muetze was given typed or handwritten reports from each investigating officer on February 8, 1983. On March 7, he moved for an order allowing him to examine, inspect, photograph, or copy the officers' original notes. This request was apparently made in search of information which could be used to impeach prosecution witnesses. On March 10, he petitioned for an order to accelerate the provisions of SDCL 23A–13–7 through 23A–13–9 and SDCL 23A–13–10(3) in order to allow him access in advance of trial to testimony given before the grand jury. The trial court granted his motion for access to the grand jury transcript and under the same order denied his motion for production of the investigating officers' original notes; his request for the names and addresses of all persons known by the prosecutor to have, seen, or heard anything unusual in the vicinity of the crime; and, his request for *any* information which could be used to impeach prosecution witnesses.

SDCL 23A–13–5 states:

Except as provided in §§ 23A–13–1, 23A–13–2 and 23A–13–4, this chapter does not authorize the discovery or inspection of reports, memoranda, or other internal prosecution documents made by the prosecuting attorney or other employees of law enforcement agencies in connection with the investigation or prosecution of the case, or of statements made by the prosecution witnesses or prospective prosecution witnesses except as provided in §§ 23A–13–7 to 23A–13–10, inclusive.

This statute has two parts. First, the statute explicitly prohibits authorization of "discovery or inspection of reports, memoranda [notes], or other internal prosecution documents made by ... employees of law enforcement agencies" *except* for (1) statements made by the defendant which are in the prosecutor's possession or intended for use at trial, discoverable under SDCL 23A–13–1; (2) the defendant's prior criminal record, discoverable under SDCL 23A–13–2; and (3) the results and reports of all examinations, tests and experiments, discoverable under SDCL 23A–13–4. The in-

vestigating officers' notes clearly do not fall within the foregoing categories.

The second part of SDCL 23A–13–5 precludes authorization for discovery of statements by a prosecution witness until after the witness has testified on direct examination per SDCL 23A–13–6. SDCL 23A–13–10 defines the term "statement," as used in SDCL 23A–13–7 to 23A–13–9, inclusive, in relation to any witness called by the prosecuting attorney, to mean

(1) A written statement made by such witness and signed or otherwise adopted or approved by him;

(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by such witness and recorded contemporaneously with the making of such oral statement;

(3) A statement, however taken or recorded, or a transcription thereof, if any, made by such witness to a grand jury;

(4) A summary of an oral declaration made by someone other than the witness that has been reduced to writing.

In our opinion, the police officers' notes which Muetze sought to discover do not fall within any of the exceptions to SDCL 23A–13–5 and the trial court was correct in denying discovery under the statute.

Muetze claims that despite the statutory provisions, the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), entitles every defendant to all exculpatory evidence in the prosecution's hands, and that *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), entitles him to all credibility evidence known to the prosecution. Muetze further contends that State's failure to provide evidence violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article VI, Section 2 of the South Dakota Constitution. Muetze cites *Brady, supra; State v. Layton*, 337 N.W.2d 809 (S.D.1983); *State v.*

*Hartley*, 326 N.W.2d 226 (S.D.1982); and S.D. Const., art. VI, § 2.

*Brady, supra,* involved a defense counsel's request to examine a codefendant's extrajudicial statements. He received several statements from the prosecution, but a statement in which the codefendant confessed to the actual homicide was withheld until after the trial and an appeal. The Court stated that "suppression of this confession [by the prosecution] was a violation of the Due Process Clause of the Fourteenth Amendment." 373 U.S. at 86, 83 S.Ct. at 1194, 10 L.Ed.2d at 218. The *Brady* Court cites and quotes *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935), to explain that nondisclosure by a prosecutor violates due process.

The confession referred to in *Brady* would be considered a "statement," as defined in SDCL 23A–13–10, and would be discoverable under our statutory provisions. In this case, all "statements" were turned over to Muetze's counsel prior to trial. We read *Brady* as an expansion of due process protections in that it eliminates the defendant's need to show bad faith on the part of the prosecutor. We do not, however, read *Brady* to raise the defendant's right to due process above a trial court's discretion to limit discovery within our statutory scheme.

*Brady, supra,* is not a fishing license; it does not permit defense counsel to ransack prosecution files and law enforcement agencies' filing cabinets. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court implied that *Brady* applies in three situations. First, it applies where the prosecution has knowingly used perjured testimony. Second, it applies in situations factually analogous to *Brady*, wherein the defendant made a pretrial request for specific evidence. Finally, *Brady* applies where only a general request for information has been made. The *Agurs* Court specifically pointed out that the prosecution need not bare its entire file to the defense. It is crucial that the prosecution's failure to dis-

close certain information result in the denial of a fair trial for the defendant. The Court noted that "the proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt." 427 U.S. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 354. The *Agurs* Court stated:

> It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.

427 U.S. at 112–113, 96 S.Ct. at 2402, 49 L.Ed.2d at 355 (footnote omitted). In *State v. Sahlie*, 90 S.D. 682, 245 N.W.2d 476 (1976), *on appeal after remand*, 277 N.W.2d 591 (1979), this court quoted and approved *Agurs, supra*. We stated that "the state is not required to make available to the defendant all of its investigations in a case." 90 S.D. at 687, 245 N.W.2d at 478 (citation omitted).

The Eighth Circuit Court of Appeals implied in *United States v. Burchinal*, 657 F.2d 985 (8th Cir.1981), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981), that the prosecutor must turn over all evidence favorable to the defendant only if that evidence is both material and likely to effect the outcome of the trial. In this case, there was so much incriminating testimony by so many witnesses that it is doubtful Muetze could have found enough impeachment evidence to change the outcome of the trial.

Muetze cites *Dennis v. United States*, 384 U.S. 855, 874–75, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973, 986 (1966), for the proposition that an *in camera* inspection by the trial judge is appropriate where the defendant demonstrates a "particularized need" for disclosure. We note that the *Dennis* Court was discussing production of grand jury testimony. The opinion states:

> The trial judge's function in this respect is limited to deciding whether a case has been made for production, and to supervise the process: for example, to cause the elimination of extraneous matter and to rule upon applications by the Government for protective orders in unusual situations[.]

384 U.S. at 875, 86 S.Ct. at 1851–52, 16 L.Ed.2d at 986. In this case, Muetze received a transcript of all the grand jury testimony.

■ In his second issue, Muetze contends that the *Brady* doctrine, which he seeks to apply to the officers' notes, extends to all information held by the prosecuting attorney and the investigating agencies which might assist him in impeaching the credibility of prosecution witnesses. Apparently, Muetze would not only have the state's attorney turn over his file for defense counsel's perusal, but would have him wander through the files and records of the police department, sheriff's department, Division of Criminal Investigation and any other agencies involved in the investigation. We have examined the *Brady* doctrine in our discussion of issue one and we find it even less applicable in issue two. The trial court noted that Muetze had the services of an investigator and was given the prior statements made by prosecution witnesses. The most damning testimony before the jury came from Muetze's own friends and associates.

■ In his third issue, Muetze alleges that the trial court erred when it refused to take testimony from subpoenaed witnesses regarding whether a police officer instructed one of the witnesses to not cooperate with the court-appointed defense investigator. Muetze moved for admission of this testimony at a pretrial hearing. The defense motion was based on a statement by Paulson's mother that Paulson had been instructed not to discuss the case with the defense investigator. The State resisted on grounds that the witness, Paulson, a friend of Muetze's, had in fact been interviewed extensively by defense counsel. The trial judge at the hearing had before him Paulson's affidavit stating that he had been extensively interviewed by defense

counsel and defense counsel's open court admission to that effect. Even assuming the truth of the defense allegation, that an overzealous police officer had so cautioned the witness, there is obviously nothing before the trial court below for him to correct. The matter had been taken care of. The claim of interference with due process rights was wholly mooted and to advance it on appeal as trial court error is frivolous.

Muetze's fourth issue involves the trial court's denial of a motion for the expenditure of additional funds for a defense investigator. In support of his motion, Muetze pointed out that when a witness' testimony contradicts prior statements to counsel and the investigating attorney's testimony as to his own observation of those statements is required, he must decide whether to testify or remain an advocate. D.R. 5–102, CODE OF PROFESSIONAL RESPONSIBILITY, SDCL ch. 16–18, Appendix.

In *Sahlie, supra,* we established four guidelines for the appointment of outside experts: (1) the request must be made in good faith; (2) the request must be reasonable in all respects; (3) the request must be timely and specifically set forth the necessity of the expert; and (4) the request must specify that the defendant is financially unable to obtain the required service himself and that such services would otherwise be justifiably obtained were the defendant financially able. Appointment of experts is not mandatory; the trial court exercises its discretion in light of the factors set out above. *See* SDCL 19–15–9; *State v. Archambeau,* 333 N.W.2d 807 (S.D.1983); *State v. Pieschke,* 292 N.W.2d 99 (S.D.1980); *State v. Vasser,* 279 N.W.2d 678 (S.D.1979).

The trial court initially authorized Muetze's use of a private investigator within a limit of $600 for fees and expenses and later allowed an additional $350 when it was requested. The trial judge also appointed an assistant defense counsel before he finally denied the third request for investigation funds. The denial was not an abuse of discretion.

Muetze's fifth, sixth, and seventh issues relate to the conduct of the voir dire examination. He first complains that the trial court required him to voir dire fifty-four prospective jurors simultaneously. It was Muetze's desire to voir dire the jury in four to six person panels. He contends that the requirement that he voir dire all fifty-four potential jurors and the first ten alternate veniremen simultaneously did not adequately enable him to detect prejudice from pretrial publicity and other sources and, therefore, violated his Fifth and Sixth Amendment rights to due process and an impartial jury. It appears that the trial court precisely followed the requirements of SDCL 23A–20–3, which provides that "[w]hen prospective jurors are called for examination, the court shall call to the jury box a number of prospective jurors equal to the number of jurors to be impaneled, the number of peremptory challenges allowed the parties, and number of alternates, if any." The trial judge had fifty-four names selected as the panel for examination, with ten names selected as standbys to replace any panel members who were excused for cause. After both sides had conducted their examination and accepted the fifty-four for cause, each side alternately struck twenty potential jurors, leaving a total of fourteen jurors in the box, two of whom were alternates.

Article VI, section 7 of our state constitution entitles Muetze to a trial by an impartial jury. *State v. Volk,* 331 N.W.2d 67 (S.D.1983); *State v. Marshall,* 264 N.W.2d 911 (S.D.1978); *State v. Belt,* 79 S.D. 324, 111 N.W.2d 588 (1961). The obligation to impanel an impartial jury lies with the trial judge who must largely rely upon his own immediate perceptions. *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). While a trial court's concern regarding expenditure for jury fees is commendable, the trial court's first responsibility is to ensure that a fair and impartial jury is seated to hear the case. In *State v. Bad Heart Bull,* 257 N.W.2d 715, 723 (S.D.1977), we stated that "[t]here is no 'right' or 'requirement' that

prospective jurors be individually examined out of the presence of other jurors. That is a precautionary procedure which may be permitted, in the discretion of the trial court, in cases surrounded by massive publicity and involving controversial issues." (Citations omitted.) *Bad Heart Bull*, of course, involved the trial of the defendants accused in the Custer County Courthouse riot.

■ While we recognize that the Florey murder was undoubtedly widely publicized in the Watertown vicinity, we do not believe that it ever rose to the status of *cause celebre* that the Custer County case did. It does appear that where twenty peremptories to the side, as provided by statute and previously noted, the method of jury selection authorized by statute may be less than desirable because of the sheer weight of numbers. We cannot, however, say that the trial court abused its discretion when it followed the statutorily approved method.

■ Muetze also contends on this appeal that the trial court improperly restricted the scope of voir dire regarding the propensity of drug users to violence. Defense counsel asked the jury panel: "Are there any of you who feel that a drug user is more likely to commit crimes of violence than the rest of us?" The prosecutor's objection to this question was sustained and the trial judge, with defense counsel's approval, clarified the question. The trial judge stated the question as follows:

> [W]hether or not if there was evidence in this trial concerning the use of marijuana or other drugs, it were going to affect the judgment of these people as fair and impartial jurors?

Defense counsel then stated that the trial court's restatement of his question coincided with his intent. The trial judge then questioned the jury panel directly:

> Now in view of what Mr. Eide (defense counsel) has asked you up to this point, and regardless of your knowledge or your contacts with drugs or people who have used them, is there anyone here on this jury panel that's going to not be a

fair and impartial juror, if that type of evidence is introduced?

One panel member raised her hand and was excused for cause. The latitude allowed counsel in voir dire of prospective jurors rests largely in the trial court's discretion. *Wilson v. Ceretti*, 210 N.W.2d 643 (Iowa 1973); *People v. Harrell*, 398 Mich. 384, 247 N.W.2d 829 (1976); *Hammill v. State*, 89 Wis.2d 404, 278 N.W.2d 821 (1979). The trial court did not abuse its discretion when it rephrased defense counsel's question to inquire whether the potential jurors could decide the case fairly and without bias; whether they could base their decision on the testimony and evidence presented; and, whether they could align their determination with the trial court's instructions on the law. *See Hammill, supra.* Voir dire is sufficient when the questions afford defense counsel the information necessary to challenge prospective jurors. *People v. Prast*, 114 Mich.App. 469, 319 N.W.2d 627 (1982).

■ The trial judge sustained the prosecutor's objection to defense counsel's attempt to question individual prospective jurors on their feelings regarding the propensity of drug users to commit violent crimes. The trial judge explained that the purpose of voir dire is to select fair and impartial jurors and he restated the question in those terms. Defense counsel agreed with the trial court's paraphrase of the question and, without objection, continued his questioning of the prospective jurors along the lines suggested by the trial judge. The question of the propriety of a question posed by defense counsel on voir dire or the trial court's restriction of voir dire is obviated when the defense counsel specifically expresses satisfaction with the trial court's treatment of the matter. *People v. Brown*, 393 Mich. 174, 224 N.W.2d 38 (1974). When defense counsel fails to object and appears to acquiesce in the trial court's restriction of a line of questioning, he is deemed to have accepted the ruling. *Id.* Defense counsel could have complied with the trial court's restriction and asked the panel as a group whether they could follow the trial court's instruction on the

presumption of innocence. Defense counsel expressed satisfaction with the question ultimately put to the jury panel and he was able to challenge for cause based upon the subsequent response. He is deemed to have waived any defects in the jury selection process. *See Id.; People v. Smith,* 122 Mich.App. 202, 332 N.W.2d 401 (1981).

▮ Finally, with respect to voir dire, Muetze contends that the trial court erred when it refused to allow defense counsel to ask questions regarding the presumption of innocence of a potential juror who admitted to holding an opinion regarding the defendant's guilt. We first note that a potential juror who indicates the inability to fairly and impartially determine guilt may be dismissed for cause at the trial court's discretion. *State v. Reeves,* 216 Neb. 206, 344 N.W.2d 433 (1984); *State v. Lamb,* 213 Neb. 498, 330 N.W.2d 462 (1983); *State v. Volk, supra; State v. Belt, supra.*

▮ The Sixth Amendment to the United States Constitution and Article VI, section 7 of the South Dakota Constitution, which guarantee a trial by an impartial jury, do not prescribe a specific test for determining the impartiality of jurors. *See State v. McLain,* 301 N.W.2d 616 (N.D. 1981). We also note that the mere expression of a predetermined opinion as to guilt during voir dire does not disqualify a juror per se. *Hammill, supra; Beavers v. State,* 63 Wis.2d 597, 217 N.W.2d 307 (1974). The test for determining whether a potential juror should be excused for cause is whether the potential juror can set aside preconceptions and render an impartial verdict. *State v. Beier,* 263 N.W.2d 622 (Minn.1978); *State v. Rowe,* 210 Neb. 419, 315 N.W.2d 250 (1982); *State v. Sarinske,* 91 Wis.2d 14, 280 N.W.2d 725 (1979); *Beavers, supra.*

▮ In the course of the voir dire, one of the jurors indicated "I had a little bit of an opinion." Whereupon the following transpired:

MR. EIDE: Are you going to put an extra burden of proof on one side or the other?

JUROR: If the evidence is there that he is not guilty, I'll vote that way.

MR. EIDE: And I'm sorry, I don't quite follow you.

JUROR: I mean if the evidence was shown that he ... there is cause that ... I mean he did not do it.

MR. EIDE: Am I going to have to prove that he is innocent what would happen in the situation if Mr. Ellison [the prosecuting attorney] fails to prove that he is guilty?

THE COURT: Now Mr. Eide let me interrupt you once again There is going to be an instruction by the court at the end of the evidence as to the burden of proof. Like most of these people have indicated they would listen to the evidence they would listen to the court's instructions, and they would follow those two things. Now I don't want you to get into a discussion with the individual jurors on burden of proof. Because if they say they will follow the court's instruction, I'll ultimately instruct them on the burden of proof.

Defense counsel deferred to the trial court's preclusion of the line of questioning. He did not challenge the juror for cause, rather, he excused him by exercising one of his peremptories. The record reveals that in the course of the voir dire defense challenged eight perspective jurors for cause, of which five were excused. Two of the other three were removed by peremptory challenge and one was permitted to sit. Muetze raises no issue regarding that juror, nor does he attempt to demonstrate that any of the twelve jurors that ultimately heard and decided his case were prejudiced.

Muetze complains that the trial court abused its discretion when it admitted into evidence color photographs of the murdered victim over his objection. This court reviewed the standards governing the admissibility of photographs of a victim's injuries in *State v. Simons,* stating:

[P]hotographs are admissible into evidence 'when they accurately portray anything which it is competent for a witness to describe in his own words, or where they are helpful as an aid to a verbal description of objects or conditions and relevant to some material issue.' Photographs are not admissible simply due to the fact that the details of the crime are vividly brought to the jury's attention or because they "incidently tend to arouse passion or prejudice." Like any other demonstrative evidence, the admission of photographs lies within the sound discretion of the trial court.

313 N.W.2d 465, 468–69 (S.D.1981), *citing State v. Rash,* 294 N.W.2d 416 (S.D.1980) and *State v. Compton,* 48 S.D. 430, 205 N.W. 31 (1925).

In *State v. Aschmeller,* 87 S.D. 367, 372–73, 209 N.W.2d 369, 372 (1973), we stated:

In a prosecution for murder it appears to be a well-established rule that photographs of the victim duly verified, are, in the discretion of the trial court, admissible in evidence as an aid to the jury even though such photographs may have the additional effect of tending to excite the emotions of the jury, as Defendant claims they did in this case.

▪▪▪▪ Obviously, the fact that the photographs in this case show the murdered victim after he had been shot in the face at point blank range does not necessarily militate against their admission. Muetze contends, however, that the first purpose of photographic evidence must be to demonstrate or to prove a controverted fact. Under this court's standard set out above, photographs are admissible (1) when they portray anything that a witness may describe, and (2) when they assist in a verbal description of objects or conditions *and* are relevant to some material issue. *Simons, supra.* State contends that the photographs admitted in this case assisted the pathologist in his testimony regarding the "impact power" of the murder weapon, the "range of fire," the "stippling pattern" on Florey's chin and chest, and the nature and scope of Florey's wounds.

If the photographs were in fact admitted as aids in the pathologist's testimony, they must also be relevant to some controverted material issue. Muetze cites *State v. Kaseman,* 273 N.W.2d 716 (S.D.1978); *State v. Kane,* 266 N.W.2d 552 (S.D.1978); *State v. Disbrow,* 266 N.W.2d 246 (S.D.1978); and *State v. Satter,* 90 S.D. 485, 242 N.W.2d 149 (S.D.1976) to demonstrate two principles: (1) the trial court's discretion, and (2) that the probative value must outweigh the prejudice.

▪▪▪▪ The probative value of evidence is directly related to the relevance of the issue to which it pertains.

It is generally understood that the trial court, in determining whether pictures or photographs should be admitted, must weigh the probative value of the photographs *in resolving a material issue* as against the danger of prejudice to the appellant through needless arousal of the passions of the jurors. [footnote omitted and emphasis added]

*State v. Kane,* 266 N.W.2d 552, 558 (S.D. 1978).

▪▪▪▪ Muetze argues that the issue in this case is who pulled the trigger and that because the answer to that question cannot be found in the photos they are not relevant and have no probative value at all. Muetze's concept of the issue is not correct. Muetze entered a plea of not guilty to the charge of first-degree murder. He thereby put every element of the offense in issue. While it is true that his defense was that his friend Paulson pulled the trigger, the State nevertheless was required to prove all of the elements of first-degree murder in their case-in-chief. The trial court reviewed State's proposed offer on two separate occasions; once, in a pretrial hearing at which it made tentative rulings and, again, in chambers during the course of the trial. It excluded some of the photographs that the State was prepared to offer and approved the remainder. It ruled on each offer and we cannot say that it was clearly erroneous. Furthermore, in light of the extensive testimony in support of the ver-

dict, we believe that any error would have been harmless.

Defense counsel attempted to elicit testimony from Muetze regarding out-of-court statements allegedly made by Todd and Paulson in order to impeach or discredit Todd. The trial court sustained the State's objection that these statements constituted hearsay.

Muetze testified that after Todd and Friske sampled the marijuana that he was attempting to sell them, "Todd Florey said it was good shit." The prosecution's objection on hearsay grounds was sustained and the statement was stricken. A few minutes later defense counsel asked Muetze to recount what he had done when he discovered that the marijuana was no longer in his trunk. Muetze stated: "[I] had gotten in a discussion with John Paulson in the middle of the driveway of the Boiler Room. He said he ....." At this point the prosecution objected on hearsay grounds and the trial court sustained the objection. Proceedings were immediately held in chambers and Muetze was allowed to answer the question outside the jury's hearing. Muetze was going to testify that Paulson had told him that "Todd Florey and Mike Friske were known rip-offs and users of people."

"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." SDCL 19–16–1(3). There is no doubt that the statements defense counsel attempted to elicit from Muetze were out-of-court statements made by Todd and Paulson. Defense counsel argued in chambers that neither of the statements objected to was offered to prove the truth of what was stated, but only to show what was said.

▨ Defense counsel's attempt to introduce testimony regarding Todd's opinion of the marijuana, which was stolen from Muetze's trunk, was not offered to prove the truth of the matter asserted but rather to show that the statement was made. The evidence was offered for the purpose of casting a shadow on Todd's reputation. Given the relative unimportance of Todd's testimony, the irrelevance of the line of questioning and the fact that Todd outlined his use of marijuana in response to defense counsel's cross-examination, if the trial court erred when it sustained the State's "hearsay" based objection, any error in excluding this testimony was harmless. Error which does not affect a substantial right shall be disregarded. SDCL 23A–44–14. *See State v. Heumiller,* 317 N.W.2d 126 (S.D.1982).

▨ The testimony defense counsel attempted to elicit regarding Paulson's statement that Todd and Friske were "rip-offs" went directly to Todd's and Friske's characters and was offered to prove exactly what it asserted. The trial court correctly excluded this statement on hearsay grounds. We also note that while character evidence is admissible to demonstrate or question a person's credibility, SDCL 19–12–4, this type of evidence may only be made by testimony as to reputation or testimony in the form of an opinion. SDCL 19–12–6. The proffered testimony did not begin to meet the foundation standards necessary for admission of opinion or reputation testimony.

The final issue Muetze raises is whether a polygraph examination administered to Paulson, or prior inconsistent statements made by Paulson, should have been admitted when offered by the defense as impeachment evidence. Paulson failed the polygraph test. Deception was indicated when Paulson answered "No" to two questions: (1) "Were you with Ken Muetze when he shot Darwin Florey on January 26th 1983?" and (2) "The night that Ken Muetze shot Darwin Florey, were you with Ken—when he shot Darwin?" Paulson testified at trial that he stayed in the trailer while Muetze went to the Florey house alone. Muetze sought admission of the polygraph in order to impeach Paulson's testimony.

Muetze bases his contention that the results of these tests should be admitted into evidence on a 1971 Federal District Court

case, *United States v. Hart*, 344 F.Supp. 522 (E.D.N.Y.1971), which holds that when the state administers a polygraph test and then does not use it, the state must show: (1) what led it to administer the test, (2) the basis for doubts regarding the test's accuracy, and (3) the reasons for not using the specific test. Muetze contends that in the absence of such a showing the defendant should be allowed to use the test results, and the prosecution can then attempt to show the unreliability of the test. The trial judge who heard this case felt that *Hart, supra,* like the *Brady, supra,* doctrine, speaks to the prosecution's duty to offer and disclose any exculpatory evidence, not to a prosecution duty to assist in impeaching state's witnesses.

In *Hart, supra,* a prosecution witness blurted out during cross-examination that he had taken a lie detector test. In this case, Muetze knew prior to trial that Paulson had taken a polygraph test. The State of South Dakota provided defense counsel with a report on the polygraph test, there was no attempt to hide evidence and no failure to disclose information to the defendant.

 We note that polygraph results are admissible for some purposes in New York Courts. *Hart, supra.* Polygraph results are not admissible as evidence in South Dakota Courts. *See State v. Watson,* 248 N.W.2d 398 (S.D.1976); *State v. O'Connor,* 86 S.D. 294, 194 N.W.2d 246 (1972). *Hart* is thus inapposite and we are not inclined to follow it. In attempting to impeach Paulson on cross-examination with the polygraph results and his alleged statements regarding that test, defense counsel was attempting to introduce evidence that he could not introduce by direct testimony. The trial court was correct in not allowing the rule against introduction of polygraph results to be circumvented in this way.

Paulson met Richard Fryer (Fryer) on the day he took the polygraph tests. Fryer was later incarcerated with Muetze. He wrote Muetze's counsel a letter alleging that Paulson told him that he consciously and intentionally lied in his responses to the authorities' questions during the polygraph test. Muetze's offer of proof on Fryer's allegation was denied and knowledge of it was kept from the jury on grounds that Fryer's statement was hearsay.

 Defense counsel sought to cross-examine Paulson regarding the polygraph results and any statements Paulson had made regarding those results. The trial court refused to admit this testimony.

 The extent of cross-examination is within the trial court's discretion. *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). In *Johnson v. Chicago & N.W. R. Co.,* 72 S.D. 580, 585, 38 N.W.2d 348, 350 (1949), this court said:

The trial court is vested with discretion in determining the method and extent of cross-examination, especially where the object of counsel is to test the accuracy and credibility of the witness.

*See State v. Brown,* 285 N.W.2d 843 (S.D. 1979).

We affirm the conviction.

All the Justices concur.

DUNN, Retired Justice, participating.

WUEST, Circuit Judge, acting as a Supreme Court Justice, not participating.